# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**TAMMY TRAVIS,**

      **Plaintiff,**

**v.**                                     **Civil Action No. 1:04CV208**
                                                **(The Honorable W. Craig Broadwater)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant" and sometimes "the Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Tammy Travis ("Plaintiff") first filed an application for DIB on November 28, 1996, wherein she alleged disability since December 8, 1995, due to fibromyalgia (R. 442-44, 488). Plaintiff's application was denied at the initial and reconsideration levels (R. 363-64). Plaintiff requested a hearing, which Administrative Law Judge James S. Quinlivan ("ALJ") held on June 9, 1998 (R. 850-76). Plaintiff was not represented by counsel and testified on her own behalf (R. 852-69). Also testifying was Vocational Expert Larry A. Bell ("VE") (R. 869-72). On September 21, 1998, the ALJ entered a decision finding Plaintiff was not disabled (R. 63-73). On October 28, 1998, Plaintiff filed a Request for Review with the Appeals Council (R. 398).

While this claim was pending before the Appeals Council, Plaintiff filed a second application for DIB on March 28, 2000, alleging disability since September 22, 1998, due to fibromyalgia, depression, plantar fasciitis, and right wrist injury with tendonitis (R. 152-54, 172). Plaintiff's application was denied at the initial and reconsideration levels (R. 58-59). On May 16, 2001, ALJ Steven Slahta held an administration hearing on Plaintiff's claim but did not issue a decision because, subsequent to the hearing, the ALJ noted, "it first became apparent [to ALJ Slahta] that the matter at hand remained subordinate to the claimant's initial November 1996 application which remained under review by the Appeals Council" (R. 20-21). Plaintiff was last insured for DIB on March 31, 2001 (R. 158-70).

On July 20, 2001, the Appeals Council vacated the September 21, 1998, decision by ALJ Quinlivan and ordered the ALJ to consolidate the 1996 and 2000 applications; clarify Plaintiff's onset of disability date; clarify the nature and severity of Plaintiff's impairments and their impact on her ability to perform work-related activities; further evaluate Plaintiff's subjective complaints and credibility; further consider Plaintiff's maximum residual functional capacity; further evaluate Plaintiff's past relevant work; obtain additional evidence from a VE, if appropriate; and provide Plaintiff an opportunity for a new hearing (R. 406-09).

Pursuant to the July, 2001, remand order of the Appeals Council, on December 27, 2001, ALJ Slahta held a third administrative hearing relative to Plaintiff's 1996 and 2000 applications. At this hearing, Plaintiff, who was represented by counsel, and VE Bell testified (R. 814-49). On June 11, 2002, ALJ Slahta issued a decision finding Plaintiff was not disabled (R. 99-122). Plaintiff filed a Request for Review with the Appeals Council, and the Appeals Council vacated ALJ Slahta's June 11, 2002, decision, remanded the case to the ALJ, and ordered ALJ Slahta to request updated records

for the relevant period at issue; correct procedural errors relative to exhibits and treating source evidence; and obtain medical expert clarification of the nature and severity of the Plaintiff's impairment on or before March 31, 2001 (Plaintiff's date of last insured) (R. 428-31).

On October 29, 2003, a fourth administrative hearing was held in this matter. ALJ Slahta presided (R. 779-813). Plaintiff's counsel, Regina Carpenter, appeared on Plaintiff's behalf. Plaintiff did not attend the hearing because she had, according to her lawyer, offered "approximately three hours of testimony" at the previous three hearings (R. 782). At the October 29, 2003, hearing, Dr. Robert Marshall, a Medical Expert, and VE James Ganoe testified (R. 779-813). On November 14, 2003, ALJ Slahta issued a decision finding Plaintiff was not disabled (R. 20-45). Plaintiff filed a Request for Review with the Appeals Council, and this request was denied on July 23, 2004 (R. 13-16). The November 14, 2003, decision by ALJ Slahta, therefore, became the final decision of the Commissioner.

## II. FACTS

Plaintiff was born on October 6, 1960, and was forty-three years old at the time of the ALJ's decision (R. 152). Plaintiff had one year of college training and past relevant work as a licensed practical nurse and home health aid (R. 173, 178, 181-83).

Medical Evidence Prior to Date Last Insured

On February 16, 1995, Plaintiff presented to Paul S. Davis, M.D., for a follow-up to her wrist injury that occurred one week earlier. Dr. Davis noted tenderness in Plaintiff's wrist (R. 592)[1].

---

[1]The undersigned acknowledges that Plaintiff, on several medical reports and examination notes, wrote subjective opinions of and made editorial comments and markings relative to her symptoms, conditions, and treatments. The undersigned reviewed and considered

3

On February 28, 1995, Plaintiff was examined by Dr. Davis, who opined her wrist had much improved. Plaintiff reported she experienced shoulder discomfort (R. 592).

On March 13, 1995, Plaintiff reported to Dr. Davis that her right shoulder discomfort continued. Dr. Davis observed good range of motion and diagnosed a right shoulder strain and resolving right wrist sprain (R. 592).

On May 20, 1995, Plaintiff was examined by Dr. Davis, who diagnosed chronic pain and overuse syndrome. He referred her for a pain management evaluation (R. 592).

On July 14, 1995, Dr. Davis referred Plaintiff to Dr. Wiley for an evaluation (R. 592).

On July 19, 1995, Bruce A. Guberman, M.D., conducted a consultative examination of Plaintiff for West Virginia Workers' Compensation Fund. Plaintiff reported the following to Dr. Guberman: 1) she had injured her wrist on February 6, 1995; 2) she had been diagnosed with a mild sprain of her right wrist by Dr. Davis; 3) her symptoms persisted and spread to her right forearm, right elbow, right upper arm, right shoulder, neck, left shoulder, left arm, and left wrist; 4) work worsened her symptoms; 5) she was advised to continue working and to "'slack off when it hurt . . . too much'"; 6) she was advised to "'work through the pain'"; 7) she had treated her pain with Voltaren, Lodine, Darvocet, Tylenol with codeine, and Amitriptyline, which had not improved her pain; 8) physical therapy slightly improved her symptoms; 9) x-rays of her right arm were normal; 10) an EMG of her right arm was normal; 11) she experienced constant swelling and pain through both arms, with the right being more severe than the left; 12) she had not experienced redness or warmth to affected areas; 13) she had intermittent coldness in the fingers on her right hand; 14) she had difficulty picking up objects; and 15) she experienced occasional stiffness in her feet in the

these notations as they appeared in the record.

4

mornings (R. 563-64).

Plaintiff informed Dr. Guberman that her condition affected her ability to work in that her conditions worsened as she worked which caused her to not work for entire days or to leave work early because of pain. Plaintiff informed Dr. Guberman that she was not taking any medications for her condition at the time of his examination of her (R. 564).

Dr. Guberman observed Plaintiff was moderately obese and ambulated with a normal gait. Plaintiff was stable at station and comfortable in supine and sitting positions. Dr. Guberman opined Plaintiff's intellectual functioning and mental status were normal. Dr. Guberman's examination of Plaintiff's head, ears, eyes, nose, throat, neck, cardiovascular system, chest, and abdomen produced normal results. Dr. Guberman observed mild tenderness in the muscles of Plaintiff's arms and moderate tenderness of Plaintiff's cervical spine. Plaintiff had no paravertebral muscle spasm, but she had decreased cervical lardosis and scattered points of more severe pain in both sides of her neck. Dr. Guberman found Plaintiff's cervical spine flexion was forty-five degrees, extension was forty-five degrees, rotation was eighty degrees bilaterally, and lateral bending was forty degrees bilaterally. Dr. Guberman opined his examination "studies [were] within normal limits" (R. 565).

Dr. Guberman's examination of Plaintiff's shoulders, knees, and neurological functioning produced normal results (R. 566-67). Dr. Guberman observed Plaintiff's wrists were tender with mild swelling and synovial thickening, especially in the radial aspect of both wrists. Dr. Guberman found Plaintiff's flexion was limited to sixty-five degrees and extension was limited to sixty degrees in her right wrist. Plaintiff's flexion and extension of her left wrist was normal. Dr. Guberman found Plaintiff's hands were tender with mild synovial thickening. Range of motion was normal. There was no atrophy and Plaintiff's strength was "5+/5+ bilaterally." She was able to write, button,

and pick up coins with either hand, but "slowly and with mild difficulty." Plaintiff's spine curvature was noted as normal by Dr. Guberman. Plaintiff's straight leg raising was normal to ninety degrees bilaterally in the supine and sitting positions. Flexion and hyperextension of the hips were normal (R. 566).

Dr. Guberman's impression was for post-traumatic pain and swelling in both arms associated with neck pain and tenderness. Dr. Guberman suggested Plaintiff be evaluated by a rheumatologist to rule out fibromyalgia and early inflammatory arthritis. Dr. Guberman opined Plaintiff had not reached a maximum degree of improvement and would benefit from another "trial of anti-inflammatory agents, rest and physical therapy" (R. 567).

On July 21, 1995, Plaintiff underwent a MRI of her cervical spine. No cervical disc herniations were identified and the study was normal (R. 591).

Plaintiff presented to Dr. Davis on August 7, 1995, with complaints of worsening shoulder pain. She stated she was not "doing well at work" (R. 590).

On August 24, 1995, Plaintiff informed Dr. Davis she experienced intermittent back, neck, and arm pain. Plaintiff reported she was having difficulty sleeping at night and that the vibrations caused by riding in a car aggravated her pain. Dr. Davis diagnosed myofibroitis and referred Plaintiff to physical therapy (R. 590).

Plaintiff reported to physical therapy at Travis Physical Therapy and Sports Medicine, Inc., on September 12, 15, 19, 20, and 26, 1995 (R. 569).

On September 27, 1995, Plaintiff was evaluated at the North Central West Virginia Pain Management Clinic by Matthew E. Midcap, M.D. Dr. Midcap noted Plaintiff's shoulder, wrist, and elbows had normal ranges of motion. Plaintiff's neurologic exam was within normal limits (R.

6

608). Plaintiff's motor and sensory examinations of her upper extremities were within normal limits. Dr. Midcap observed the presence of trigger points in the bilateral suprascapular trapezius areas of Plaintiff's neck. He noted Plaintiff's wrist x-ray, right shoulder x-ray, EMG, and cervical spine MRI were normal. Dr. Midcap diagnosed myofascial pain, prescribed Desyrel, requested a series of injections at Plaintiff's trigger points, and recommended Plaintiff continue with physical therapy. Dr. Midcap opined he did not "see . . . anything that is going to be a long term disability at this point in time" (R. 609).

Plaintiff reported to physical therapy at Travis Physical Therapy and Sports Medicine, Inc., on October 2, 6, 10, and 17, 1995 (R. 568-69).

On November 14, 1995, Paul S. Caplan, M.D., of Arthritis and Internal Medicine Associates, examined Plaintiff. He opined she was not in any discomfort. Dr. Caplan found Plaintiff's skin, eyes, ears, nose, mouth, throat, chest, lungs, abdomen, extremities, lymph nodes, and neurological system were normal (R. 577-78). Dr. Caplan observed tenderness of Plaintiff's biceps muscle and forearms over brachial radialis and tenderness in her left trapezius. He found Plaintiff had full range of cervical motion, shoulder motion, and elbow motion. Dr. Caplan opined Plaintiff's hands functions were normal, she had no atrophy, and she had no swelling of her hand or wrist joints. Plaintiff's strength in both hands was good and she had no tenderness over her shoulders, elbows, hands, or wrist joints. Dr. Caplan also opined Plaintiff had no abnormalities in the lumbar spine or lower extremity joints (R. 578). Plaintiff underwent laboratory studies at the Arthritis and Internal Medicine Associates (R. 579-80).

On November 20, 1995, Dr. Caplan reported his examination and laboratory test findings to the State of West Virginia Workers' Compensation Fund. He noted Plaintiff's Latex agglutination

test for rheumatoid arthritis was negative; anti-nuclear antibody titler test was negative; and thyroid stimulating hormone test was normal. Dr. Caplan opined Plaintiff had autonomic dysfunction and myofascial pain syndrome and suggested treatment with Prednisone, but not trigger point injections. Dr. Caplan recommended Plaintiff continue an exercise program, but not physical therapy (R. 573). Dr. Caplan opined Plaintiff had not reached maximum degree of medical improvement and was not totally disabled. Dr. Caplan opined Plaintiff could return to "light duty." Dr. Caplan did not assign an impairment rating to Plaintiff (R. 576).

On November 27, 1995, Plaintiff returned to Dr. Midcap. He noted she had not gotten her prescription for Desyrel filled, had ceased physical therapy, and continued her home stretches. Dr. Midcap observed Plaintiff's upper extremities motor and sensory examinations were normal and she was positive for bilateral suprascapular trapezius trigger points. Dr. Midcap provided a series of trigger point injections of Marcaine to Plaintiff (R. 607).

On December 13, 1995, Plaintiff was examined by Richard M. Vaglienti, M.D., a doctor at the North Central West Virginia Pain Management Clinic. He noted Plaintiff's recent "IME . . . indicate[d] some form of autonomic dysfunction." Plaintiff informed Dr. Vaglienti that she had experienced a headache for one week after her November, 1995, trigger point injections. Dr. Vaglienti diagnosed chronic pain due to work related injury. He provided "[m]edications . . . to last until she can see Dr. Midcap," who would determine a treatment plan for Plaintiff (R. 606).

On January 3, 1996, Hugh M. Brown, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour

workday, and push/pull unlimited (R. 582). Dr. Brown found Plaintiff was frequently limited in climbing, balancing, stooping, kneeling, crouching, and crawling (R. 583). Dr. Brown found Plaintiff had no manipulative, visual, communicative, or environmental limitations (R. 584-86).

On January 5, 1996, Plaintiff was examined by Dr. Midcap. He observed her symptoms were "more autonomically based" as her hands sweated and she experienced a "tingling sensation if she brushes her skin lightly over her forearms." Dr. Midcap's examination of Plaintiff revealed a positive Tinel's sign bilaterally at the cubital tunnel area and a negative Tinel's sign over her median nerve areas at the wrist. Dr. Midcap observed "hyperesthesia to light touch over the radial aspect of the right forearm that sent a tingling sensation into the right thumb area," sweaty palms, and trigger points in neck and shoulders. Dr. Midcap diagnosed myofascial pain. Dr. Midcap noted he agreed with Dr. Caplan's diagnosis of autonomic dysfunction even though this diagnosis was "totally different from [his] initial examination of [Plaintiff] as well as her reexamination of 11/27/95." Dr. Midcap's treatment of Plaintiff included seeking approval from West Virginia Workers' Compensation Fund for "cervical sympathetic block via the epidural root" and a "short course of steroids as per Dr. Caplan's recommendation" (R. 604). Dr. Midcap instructed Plaintiff to cease talking Cataflam. He prescribed Darvocet and a Medrol Dosepack (R. 605).

Plaintiff returned to Dr. Midcap on February 21, 1996, for a follow-up consultation for her pain. He noted West Virginia Workers' Compensation Fund approved his request for cervical sympathetic epidural block. Dr. Midcap ordered testing of Plaintiff, which included "a CBC, Sed rate, Chem-20, Thyroid profile and CEA" and a "MRI with contrast of the brain." Dr. Midcap performed a cervical sympathetic epidural block on Plaintiff (R. 602).

On March 6, 1996, Plaintiff presented to Robert A. Garvin, D.O., at the North Central West

Virginia Pain Management Clinic. Dr. Garvin noted the results of Plaintiff's thyroid panel, complete blood count, chemical profile, and sedimentation rate tests as ordered by Dr. Midcap were normal. Plaintiff informed Dr. Garvin that her neck pain was no worse but her arm and upper back pain was worse following the cervical epidural steroid injection on February 21, 1996. Plaintiff stated her arms felt "achy and heavy and her hands [felt] like they [were] tingling all of the time." Plaintiff informed Dr. Gavin that she was not helped by the epidural injection. Plaintiff informed Dr. Gavin that she took three to four Darvocets per day, which "barely [took] the edge off her pain"; her pain was a five to six on a the "Visual Analogue Scale"; her activities had decreased; and she was sleeping poorly. Dr. Garvin prescribed Neurontin 100mg, three times per day, and ordered a MRI of Plaintiff's brain with contrast (R. 600).

On March 22, 1996, Plaintiff returned to the North Central West Virginia Pain Management Clinic for a follow-up consultation with Dr. Garvin. Dr. Gavin noted all of Plaintiff's imaging tests and laboratory findings relative to Plaintiff's condition were negative. Plaintiff informed Dr. Garvin that Neurontin had "not helped at all" and that she continued to take three to four Darvocet per day. Plaintiff refused the MRI of the brain with contrast because she did "not want to put those kind of chemicals into her body." Dr. Garvin, therefore, ordered a MRI without contrast. Dr. Garvin prescribed Neurontin 300mg and Darvocet (R. 598). Dr. Garvin opined that "[w]ith all of the normal studies performed up to this point I would be hard pressed to diagnosis any specific pain syndrome. It would be my recommendation at [this] time that if she continues to complain of paresthesia like symptoms into her arms and hands that she see a neurologist for possibly a repeat EMG. At this time I do not see any further signs or symptoms of reflex sympathetic disease or autonomic dysfunction" (R. 599).

On April 19, 1996, Plaintiff returned to Dr. Garvin for a follow-up examination for her neck, shoulder, and bilateral upper extremity pain and tingling sensations. Plaintiff complained of "heavy deep pain around her shoulder and right arm which . . . prohibited her from driving or rubbing lotion on her hands due to an increase in pain." Dr. Garvin observed Plaintiff's "hair [was] obviously well manicured as well as her make up applied which would appear to be extremely difficult to do with just one hand." Plaintiff stated her pain score was a "VAS 5 to 6." Plaintiff informed Dr. Garvin Neurontin made her hands sweat; she took four Darvocet per day instead of the three prescribed and had exhausted that prescription; she took Motrin and Tylenol for pain; and she had been sleeping fairly well. Dr. Garvin opined that he was "not sure what [was] causing her pain symptomatology" as all imaging testing and laboratory findings were normal. Dr. Garvin prescribed Neurontin and Darvocet to Plaintiff (R. 596). Dr. Garvin opined that, if the MRI of Plaintiff's brain were normal, he would inform West Virginia Workers' Compensation Fund that he had "no definitive diagnosis for [Plaintiff] and barring any revelations from a Neurologists [sic] she can and should return to work" (R. 597).

On May 5, 1996, Plaintiff reported to Arthur Calhoun, M.D., at the Doddridge Medical Center, that she experienced long term pain problems in her arms, was "not pleased" with the pain clinic, and wanted her care to be "transferred to neurologist" (R. 628).

On May 10, 1996, Plaintiff returned to Dr. Davis for a physical for admission to nursing school. Dr. Davis opined Plaintiff was in "good health" and he completed the medical admission form (R. 589).

On May 17, 1996, Plaintiff presented to Dr. Garvin with complaints of "'nerve like' pains which shoot from her elbows to her fingers and from her neck down her arms." Dr. Garvin again

11

noted Plaintiff's appearance included "well manicured" hair and appropriately applied makeup, which would "be impossible when using only one hand." Dr. Garvin also noted Plaintiff continued "to call the clinic in between appointments for more narcotics and increasing Darvocet." Dr. Garvin noted these requests had "been denied because Darvocet t.i.d. for what apparently seem to have been a simple muscle strain should be adequate." Plaintiff stated Neurontin did not successfully treat her pain and that she had taken "3 Talwin from her brother-in-law over the last two weeks for her pain." Dr. Garvin "warned [Plaintiff] that as a nurse, she should know better, that she should not take someone else's medication." Plaintiff informed Dr. Garvin that she had been using someone else's TENS unit and had realized no relief therefrom. Dr. Garvin opined that "[a]t this point, I have again for the third time, explained to the patient that I really have nothing more to offer her. I do not know what is causing her pain symptomatology." Dr. Garvin recommended Plaintiff "find another physician that may be of help to her." He also recommended a repeat EMG as Plaintiff was "insistent that her pain revolves around a nerve problem" (R. 594). Dr. Garvin noted that, absent a diagnosis, he was not "comfortable prescribing her Darvocet." At Plaintiff's "insistence," she was referred to Dr. Applewhite (R. 595).

On May 30, 1996, Plaintiff reported to Dr. Calhoun that her wrist discomfort had progressed to her right arm, neck, and upper back (R. 628). Dr. Calhoun observed Plaintiff's arms were nontender, but her upper back was tender (R. 627).

On August 7, 1996, Dr. Calhoun secured an appointment for Plaintiff with Michael A. Morehead, M.D., a neurologist (R. 626).

On July 25, 1996, Plaintiff reported to Dr. Calhoun that she was experiencing "pretty bad pain in upper back and arms." Plaintiff reported that some days she did not take pain medications,

but that the pain was still severe. Plaintiff stated the pain existed in her arms and between her shoulder blades and her back. Plaintiff informed Dr. Calhoun that she had "sore feet" and felt a "different pain" in her feet. Dr. Calhoun observed Plaintiff was cool rather than sweaty and that the pain in Plaintiff's arms had improved (R. 625).

On August 12, 1996, Plaintiff presented to Dr. Calhoun, complaining of "a lot of pain." She stated Ultram helped "sometimes, sometimes not." Dr. Calhoun prescribed Tylenol with codeine (R. 626).

On August 21, 1996, Plaintiff informed Dr. Calhoun she was "having a lot of pain." Dr. Calhoun prescribed Toradol and Vistaril for Plaintiff (R. 626).

On September 3, 1996, Dr. Calhoun provided a prescription for a refill of Tylenol with codeine to Plaintiff (R. 626).

On September 24, 1996, Dr. Morehead completed a medical report of Plaintiff. He reviewed the report of Dr. Caplan. Dr. Morehead also reviewed a MRI of Plaintiff's cervical spine which was provided by Plaintiff (R. 610). He observed "minor bulging of the C5-6 disc, especially toward the left." Dr. Morehead's examination of Plaintiff showed "no Horner's syndrome"; normal cranial nerves; "free range of motion of the neck in all directions"; no cervical paraspinal spasm; no point tenderness in the upper half of Plaintiff's body; no limitation of motion of any joint; no swelling; "excellent grade V strength" of motor function; no atrophy; no fasciculations; deep tendon reflexes of 1+ at all levels of arms, legs, and ankle jerks; distal hipalgesia in all five fingers in both hands, which Dr. Morehead considered "unimportant"; negative Tinel's sign; and negative Phalen sign. Dr. Morehead did note Plaintiff, by history, stated she experienced "fluctuating point tenderness around the elbows, wrists, shoulders, etc." (R. 611).

Dr. Morehead opined he "[thought] [Plaintiff] is one of those unfortunate individuals who have developed a diffuse pain syndrome from a trivial injury. Some would call this fibromyalgia even though it doesn't fit the classical trigger point requirements." Dr. Morehead recommended Plaintiff continue an exercise program, which he considered was "probably the best therapy for this" (R. 611).

On September 30, 1996, Plaintiff returned to Dr. Calhoun, who discussed the findings of Dr. Morehead with her (R. 626). Plaintiff informed Dr. Calhoun she experienced pain in her arms and neck. Dr. Calhoun's examination of Plaintiff revealed tenderness in Plaintiff's left forearm, but no other overtly tender areas were noted (R. 624).

On October 10, 1996, Dr. Calhoun prescribed Tylenol with codeine to Plaintiff (R. 624).

On October 29, 1996, Charles A. Lefebure, M.D., completed an "Evaluation for Worker's Compensation" of Plaintiff. Dr. Lefebure's examination of Plaintiff revealed she "walked easily without a gait disturbance"; she could squat ; she could stand on her heels and toes; and her spine was straight. Plaintiff "could abduct and raise her arms rather well and reach around behind her and across her body," even though she complained "of some soreness and pain at her shoulders" (R. 613). Dr. Lefebure observed Plaintiff's "elbows, wrists and fingers all moved well without obvious crepitation or swelling or deformity or limitations of motions." He noted Plaintiff's joints were supple and she showed no signs of synovial thickening or inflammation in her wrists or fingers. Plaintiff demonstrated good finger spreading, flexion, and extension. Plaintiff had full range of flexion and extension of her right wrist and no right wrist crepitation, synovial thickening, or erythema. Plaintiff had full range of motion in her biceps, triceps, and brachioradialis of both upper extremities. Dr. Lefebure diagnosed "sprain, right wrist with considerable residual symptoms,

unable to define." Dr. Lefebure opined Plaintiff had reached maximum medical improvement and could return to her work as a licensed practical nurse. Dr. Lefebure opined Plaintiff did not have any residual permanent impairment from her February 6, 1995, injury (R. 614).

On November 15, 1996, Dr. Calhoun discussed with Plaintiff the information contained in her records from the pain clinic and what options were available to her for future treatment. Plaintiff informed Dr. Calhoun she had "been reading bout chronic fatigue and fibromyalgia" and that she was not depressed (R. 624).

On November 22, 1996, A. N. Patel, M.D., a neurologist and psychiatrist, performed a neurological examination of Plaintiff (R. 618). Plaintiff complained of "neck pain and interscapular pain and pain and numbness in her arms and legs." Dr. Patel's examinations of Plaintiff's head, eyes, ears, nose, throat, neck, heart, chest, lungs, abdomen, extremities, motor strength, sensory, and neurologic systems produced normal results. Dr. Patel noted Plaintiff "had trigger points at the paracervical, upper trapezius, interscapular, iliac crests and elbows medially." Dr. Patel diagnosed "[q]uestionable fibromyalgia." He recommended Plaintiff be examined by a rheumatologist. Dr. Patel opined Plaintiff had not reached a maximum degree of improvement and that it was premature to rate Plaintiff's impairment. Dr. Patel further opined Plaintiff would benefit from vocational rehabilitation (R. 620).

Plaintiff reported to Dr. Calhoun on November 26, 1996, that Dr. Patel "felt" Plaintiff had fibromyalgia. Plaintiff stated she experienced pain all over her body and it was worse in her "neck to base of head." Dr. Calhoun prescribed Tylenol with codeine (R. 623).

On December 30, 1996, Plaintiff requested a "work excuse" until February 5, 1997. Dr. Calhoun granted the request and sent the excuse to "Lisa Dotson" (R. 622).

15

On January 28, 1997, Dr. Calhoun prescribed Tylenol with codeine to Plaintiff (R. 672).

On February 3, 1997, Plaintiff returned to Dr. Calhoun for the purposes of obtaining his signature on "a yellow paper for work release" and a "written report stating disability" for West Virginia Workers' Compensation Fund. Plaintiff reported she experienced leg pain, upper arm pain, pain between shoulder blades, and dry eyes (R. 672). Dr. Calhoun diagnosed pain in neck, arm and legs (R. 671). Dr. Calhoun prescribed Tylenol with codeine to Plaintiff (R. 672).

On February 14, 1997, Dr. Calhoun wrote to the West Virginia Workers' Compensation Division relative to Plaintiff's complaints and the findings of other examining physicians (R. 638). Dr. Calhoun wrote that Plaintiff's "slight injury was the precipitating event that lead [sic] to the pains in the other part of her body and her dysfunction. The only further treatments suggested recently by consultants has [sic] been to continue exercising and seek vocational rehabilitation. At this point in time, nothing tried thus far has brought her significant relief" (R. 639).

On March 10, 1997, Dr. Calhoun prescribed Tylenol with codeine to Plaintiff (R. 671).

On April 7, 1997, Plaintiff reported to Dr. Calhoun for her "regular" two-month Workers' Compensation checkup. Dr. Calhoun noted Plaintiff complained of pain in her upper back (R. 671). Plaintiff reported she experienced pain in her arm and feet and that her eyes burned and felt dry. Plaintiff informed Dr. Calhoun that she did a "little walking," did a "little sweeping," loaded the dishwasher and clothes washer, and prepared meals. Plaintiff stated she had "few friends, and did "little [with] other people." Dr. Calhoun observed tenderness in Plaintiff's upper back and pain in Plaintiff's feet upon compression. Her eyes appeared normal. Dr. Calhoun diagnosed pain in Plaintiff's back and feet and fibromyalgia (R. 668).

On April 9, 1997, Fulvio R. Franyutti, M.D., a state-agency physician, completed a Physical

Residual Functional Capacity Assessment of Plaintiff. Dr. Franyutti opined Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and unlimited push and/or pull (R. 630). Dr. Franyutti found Plaintiff had no postural, manipulative, visual, communicative or environmental limitations (R. 631-33). Dr. Franyutti found Plaintiff's RFC was reduced to medium (R. 635).

On May 1, 1997, Plaintiff presented to Ohio Rehab Center, Inc., for a Physiatric Examination, which was conducted by Karen Gade, M.D. (R. 645, 689). Plaintiff stated she awakened frequently during the night for pain or "for no reason at all." Plaintiff stated she experienced irritable bowel, decreased concentration, difficulty with balance, and foot pain when weight bearing. Plaintiff reported she had undergone physical therapy that did not include strengthening programs, conditioning exercises, or pool programs; received a cervical epidural, which provided no relief; received chiropractic care, which increased her back pain; received trigger point injections, which did not relieve her symptoms; and medicated with Medrol Dosepack, Neurontin, and Catapres, which did not relieve her pain (R. 645, 689).

Dr. Gade's examination of Plaintiff revealed she was obese with a gait that was mildly antalgic and "somewhat functional." Plaintiff could toe walk without difficulty; she complained of foot pain with heel walking. Dr. Gade noted Plaintiff reported she was tender "to palpation in the majority of the fibromyalgia tender points." Dr. Gade counted "11 of 18 tender points with associated focal muscle spasm in the majority of the areas." Plaintiff's strength, ranges of motion, and reflexes were normal in her upper and lower extremities. Plaintiff's sensory examination was grossly intact throughout to pin prick. Dr. Gade noted Plaintiff reported "tenderness to palpation

17

of the plantar fascia insertions to the calcanei" and "tenderness with metatarsal compression" (R. 646, 690).

Dr. Gade diagnosed fibromyalgia and plantar fasciitis. Dr. Gade noted that since Plaintiff lived three hours from the clinic, she would make recommendations to Dr. Calhoun relative to Plaintiff's diagnosis, treatment, and medications. Dr. Gade prescribed Nortriptyline (R. 646, 690). Dr. Gade recommended Plaintiff take Fibroplex and Fibercon. Dr. Gade informed Plaintiff that it was "very important for her to be actively involved in a rehabilitation program with gradual progressive exercises even if they are a little more uncomfortable initially." Dr. Gade recommended Plaintiff use orthotics for treatment of plantar fasciitis (R. 647, 691).

On May 1, 1997, Dr. Gade corresponded with Dr. Calhoun relative to her consultative examination of Plaintiff (R. 687). Dr. Gade informed Dr. Calhoun that she "agree[d] that [Plaintiff] has fibromyalgia" and recommended a "comprehensive physical therapy program" for her. Dr. Gade wrote Plaintiff's treatment should "include superficial modalities such as heat and ice, spray-and-stretch . . . [and] heating with . . . stretching." Dr. Gade suggested Plaintiff receive weekly massotherapy treatments, exercise on a treadmill and bicycle, or walk (R. 687).

On May 1, 1997, Dr. Calhoun authored a letter wherein he stated Plaintiff had received a "diagnosis of fibromyalgia" which caused pain in "several parts of her body." Dr. Calhoun wrote that "a warm whirlpool helps her considerably." He stated he felt "that a home whirlpool that she could immerse herself in would be good treatment for this lady, who suffers daily" (R. 637).

On May 15, 1997, Plaintiff presented to Physical Therapy Associates upon referral from the West Virginia Division of Rehabilitation Services. A report of that evaluation was produced on July 31, 1997 (R. 640, 692). Plaintiff stated she experienced pain throughout her body, which worsened

18

with sitting and activity. Plaintiff reported she was unable to drive "except when she has to."

Plaintiff stated she did occasional housework, found it difficult "to get off the couch . . some days,"

could walk three quarters of mile two times per week, experienced less pain after using a "hot tub,"

medicated her pain with Tylenol, experienced worsened pain after trigger point injections,

experienced weakness in her legs, and had irritable bowel syndrome and epigastric reflux. Plaintiff

completed a Pain Profile Questionnaire, and her scores reflected that she could be "considered a

symptom magnifier with a low pain tolerance threshold" (R. 641, 693). Plaintiff's left and right

wrists displayed active ranges of motion with normal limits and 5/5 strength (R. 642, 694). It was

noted that Plaintiff "performed poorly with this Functional Capacity Evaluation" and could perform

work at the sedentary level. It was recommended that Plaintiff seek treatment at a pain clinic and

from a physiatrist. It was also recommended that Plaintiff undergo "Neuro-Psych testing" because

of her "inappropriate illness behavior that was observed during [the] evaluation" (R. 643, 695).

Plaintiff reported to Dr. Calhoun on May 15, 1997, with complaints of neck pain and that

she felt "terrible" after the evaluation at Physical Therapy Associates. Dr. Calhoun prescribed

Tylenol with codeine (R. 665).

On June 3, 1997, Plaintiff reported to Dr. Calhoun that her "pain has been better last couple

weeks," but her fatigue was "just as bad." Dr. Calhoun's examination revealed Plaintiff's left heal

was tender and neck and right wrist were painful. Dr. Calhoun diagnosed pain of Plaintiff's heels

and fibromyalgia (R. 664).

At her July 28, 1997, appointment with Dr. Calhoun, Plaintiff's weight registered at two-

hundred-and-five pounds. She stated she did not feel "any better" as she continued to experience

pain in her legs and back and sleeplessness. Plaintiff informed Dr. Calhoun her heels and feet

"bother[ed] her" (R. 664). Plaintiff stated she did not exercise in the form of walking, bicycling, or using a treadmill because of fatigue. Plaintiff informed Dr. Calhoun she used a whirlpool daily. Plaintiff stated her original injury did not "bother her." Dr. Calhoun diagnosed fibromyalgia and plantar fasciitis (R. 663).

On July 29, 1997, Leonard A. Fichter, D. O., examined Plaintiff (R. 651). Dr. Fichter noted Plaintiff's "perception of her condition encompasses a total limitation to her ability to function in society today." Plaintiff stated she experienced pain and numbness in her extremities which made it difficult for her to heel walk and toe walk. Plaintiff informed Dr. Fichter she had difficulty picking up and doing fine motor activities. Plaintiff stated her condition precluded her from taking care of her home, caring for her children, or cooking. Dr. Fichter noted Plaintiff's test results provided no evidence of "real bony pathology" and her laboratory testings were negative (R. 652).

Dr. Fichter diagnosed "complex wrist strain and sprain with possible relationship to fibomyalgia only in that her symptomatology was not present prior to the injury." Dr. Fichter opined Plaintiff's prognosis was fair and that she did not need any further consultations. He wrote he did "not feel that the trauma from the wrist is directly associated with the fibromyalgia" but that her systemic problem may have been secondary to other causes which were "exaggerated and/or triggered by her initial injury" (R. 652). Dr. Fichter opined Plaintiff was temporarily totally disabled at the time of his examination of her and that she had reached maximum degree of medical improvement. Dr. Fichter found Plaintiff's compensable impairment was for her wrist injury and not fibromyalgia. He rated her impairment at sixteen percent. He found Plaintiff could "return to the work force in the future once her medications have been tailored to fit her needs" and could be rehabilitated to perform other tasks (R. 653).

On September 12, 1997, Dr. Calhoun prescribed Tylenol with codeine to Plaintiff (R. 663).

On September 15, 1997, Plaintiff presented to Dr. Calhoun with complaints of acid reflux. She requested an updated "attending" physician report be provided to West Virginia Workers' Compensation Fund. Plaintiff's weight was two-hundred-and-three pounds. Dr. Calhoun noted Plaintiff's "heels [were] somewhat better" and she had "a few painful spots" on her shoulders. He diagnosed fibromyalgia and "reflux" and prescribed Tylenol with codeine to Plaintiff (R. 662).

On September 24, 1997, Plaintiff returned to Ohio Rehab Center, Inc., and was examined by Valdimir Djuric, M.D., and Mark J. Pellegrino, M.D. (R. 648, 703). They noted Plaintiff reported with "exacerbation of her fibromyalgia." Plaintiff stated she experienced "especially intense [pain] between the shoulder blades and arms" and in her hips and feet. Plaintiff reported experiencing heartburn and gastroesophageal reflux; difficulty sleeping; difficulty thinking; headaches; dropping objects frequently; and dry eyes. Plaintiff stated her symptoms were aggravated with cold, damp weather; stress; or "any type of activity" and were relieved with her using a hot tub. Drs. Djuric and Pellegrino observed Plaintiff moved in a "guarded fashion." Plaintiff had full range of motion of her cervical spine, shoulders, elbows, and wrists, but mild restriction in her lumbar spine range of motion. Drs. Djuric and Pellegrino found Plaintiff's hip, knee, and ankle joints were unremarkable. Plaintiff had no joint swelling. Drs. Djuric and Pellegrino found Plaintiff had "multiple tender points including the suboccipital area, interscapular area, upper trapezii, pecs, wrist flexors and extensors, medial knees, buttocks, and tensor fascia lata" (R. 648, 703). Drs. Djuric and Pellegrino opined "[i]t certainly does appear that [Plaintiff] has had an exacerbation of her fibromyalgia. There is nothing to suggest a metabolic or neurologic abnormality on physical examination." Drs. Djuric and Pellegrino further opined that Plaintiff "really does need to follow through with the aggressive,

multi-faceted rehabilitation approach as outlined by Dr. Gade. This would include a graduated physical therapy program initially starting with some superficial modalities and massage, then gradually adopting a more active stretching, strengthening, and conditioning program. It is extremely important [for Plaintiff] to progress through the program very slowly in order to prevent aggravation of her symptoms." Drs. Djuric and Pellegrino provided samples of Serzone to Plaintiff (R. 649, 704).

On October 14, 1997, Dr. Calhoun authored a letter that requested that Dr. Gade's recommendations that Plaintiff receive physical therapy and massage therapy be considered for approval (R. 702).

On November 17, 1997, Plaintiff reported to Dr. Calhoun that she was being treated by a physical therapist and a massage therapist. Plaintiff's weight was registered at two-hundred-and-nine pounds. She stated "colder weather [was] harder on her," and she experienced pain in her arms and neck. Plaintiff stated Tylenol with codeine alleviated her pain "a little." Dr. Calhoun diagnosed fibromyalgia (R. 661).

On November 19, 1997, John T. Travis, Plaintiff's physical therapist at Travis Physical Therapy and Sports Medicine, Inc., corresponded with West Virginia Workers' Compensation Fund. He wrote he had attempted to engage Plaintiff in "therapeutic exercises," but that she was "not very tolerant of this," and he had been unsuccessful in his efforts to get Plaintiff to "work through the exercises" so that she would "become more comfortable with them" (R. 654).

On November 20, 1997, Dr. Calhoun prescribed Flexeril to Plaintiff (R. 661).

On December 1, 1997, and January 2, 1998, Dr. Calhoun prescribed Tylenol with codeine to Plaintiff (R. 660).

On January 12, 1998, Plaintiff reported to Dr. Calhoun that she felt "lousy" because her body ached all over, especially her right arm. She informed Dr. Calhoun that Tylenol with codeine was "not helping." Plaintiff requested release from work form from Dr. Calhoun. Dr. Calhoun prescribed Serequan, Tylenol with codeine, Flexeril, and Prozac (R. 660). Dr. Calhoun noted Workers' Compensation informed him that Plaintiff would undergo rehabilitation so she could return to work. Plaintiff stated she experienced pain in her right arm and "L-S spine area," but less pain in her heels. Dr. Calhoun's examination revealed Plaintiff's right arm was not tender to touch and her spine area was not "greatly sore." Dr. Calhoun diagnosed fibromyalgia, insomnia, and pain in arm and back (R. 658).

On February 10, 1998, Dr. Calhoun prescribed Tylenol with codeine to Plaintiff (R. 658).

On March 2, 1998, Dr. Calhoun prescribed Tylenol with codeine to Plaintiff and discussed increased use of this drug with her (R. 658).

On March 8, 1998, a physician from Pennsboro Medical Center made a "housecall" to Plaintiff because of "severe pain back of shoulders rad to base of neck." Plaintiff informed the doctor that she had taken "Tylenol #3 6 tabs since noon & it hasn't helped." Plaintiff did not experience pain in her arms or weakness in her hands (R. 657). Plaintiff complained of multiple areas of tenderness in Plaintiff's upper back and at the base of her skull at her neck. The doctor diagnosed fibromyalgia and prescribed Toradol (R. 658).

On March 10, 1998, Plaintiff returned to Dr. Calhoun. She reported frequent headaches and that Ambien was no longer helping her sleep. Plaintiff reported "sore points" in her neck, back and shoulders (R. 656). Dr. Calhoun diagnosed fibromyalgia and insomnia (R. 655).

On March 12, 1998, Plaintiff underwent a Psychological Interview with William Fremouw,

Ph.D. Plaintiff informed Dr. Fremouw that she was "applying for disability benefits because "I hurt my right wrist at work. Pain spread over my body. I have migraines, irritable bowel, fatigue, fibromyalgia." Plaintiff stated she experienced tenderness in her shoulder, head, and hands; pain which interrupted her sleep; fatigue; inability to do physical activities; crying about once per week; poor energy level; and occasionally depressed mood. Plaintiff informed Dr. Fremouw that pain medication "sometimes helps, but not always." Plaintiff rated her pain as a six on a scale of one to ten. Plaintiff denied suicidal or homicidal ideations, phobias, panics, or PTSD (R. 673).

Plaintiff described her mood as "'not very good." Dr. Fremouw administered the WAIS-R, on which Plaintiff scored the following: Verbal Scale IQ was 92; Performance Scale IQ was 79; and Full Scale IQ was 85 (R. 674). Plaintiff scored the following on the WRAT-III: reading was post high school; spelling was post high school; and arithmetic was sixth grade (R. 675).

Plaintiff's subjective symptoms were pains "all over." Dr. Fremouw's objective findings were as follows: 1) Plaintiff took pain medication and muscle relaxants, but no psychotropic medications; 2) Plaintiff had "some problems with sleep"; and 3) no medical records were available to "confirm or disconfirm the physical basis of her pain. It cannot be determined whether it is psychological in origin." Dr. Fremouw's impression was for the following: Axis I – pain disorder with psychological and physical factors; Axis II – no diagnosis; Axis III – fibromyalgia (by self-report) (R. 675).

Plaintiff stated her activities of daily living involved the following: awoke at 6:30; readied children for school; used the dishwasher; performed light housework; rested in the afternoon; used a hot tub at night; occasionally read; and retired between 8:00 p.m. and 10:00 p.m. Plaintiff stated her fifteen-year-old assisted with cooking, her family assisted with laundry, and she shopped with

her husband one time per week. Plaintiff stated she bathed regularly, visited with those friends who came to her home, camped with her family in the summer, and visited relatives periodically. Plaintiff did not attend church or belong to any social clubs (R. 675). Dr. Fremouw found Plaintiff was competent to manage her own finances (R.675-76).

Dr. Fremouw completed a Medical Assessment of Ability to do Work-Related Activities (Mental) of Plaintiff On March 12, 1998. Dr. Fremouw found Plaintiff's abilities to follow work rules, relate to co-workers, use judgment, and interact with supervisors were "good." Dr. Fremouw found Plaintiff had a "fair" ability to deal with work stressors, function independently, and maintain attention and concentration (R. 677). Dr. Fremouw found Plaintiff's ability to understand, remember, and carry out complex job instructions was fair; her ability to understand, remember, and carry out detailed, but not complex job instructions, was good; and her ability to understand, remember and carry out simple job instructions was unlimited. Dr. Fremouw found Plaintiff had a good ability to maintain personal appearance and a fair ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability (R. 678).

On April 7 and 9, 1998, Plaintiff received physical therapy from Affiliated Physical Therapy (R. 729-32).

On April 13, 1998, Dr. Calhoun corresponded with the Social Security Administration relative to Plaintiff's condition. He recounted the opinions of Plaintiff's doctors and the treatment she had received for her symptoms. Dr. Calhoun opined Plaintiff could not "do her previous job as a nursing home LPN with her present discomfort level" (R. 685). Dr. Calhoun wrote he was not "an expert in fibromyalgia," but he felt Plaintiff "received an injury to her wrist on February 6, 1995 and that what happened that day has directly resulted in her on-going problems. Hopefully,

retraining for more sedentary work will provide an opportunity for gainful employment" (R. 686).

On April 14, 21, and 23, 1998, Plaintiff received physical therapy from Affiliated Physical Therapy (R. 726-28).

On April 27, 1998, Russell Biundo, M.D. of A.B.P.M.R., Inc., Physical Medicine & Rehabilitation of Clarksburg, West Virginia, performed a consultative examination of Plaintiff (R. 733). Dr. Biundo observed Plaintiff was "significant for diffuse pain associated with muscular pain throughout." Plaintiff did not have a cough, productive sputum, severe depression, suicidal ideations, cramping, abdominal pain, burning with urination, dysuria, tremors, dizziness, seizure activity, or lymph node difficulties. Dr. Biundo opined Plaintiff was "mildly over weight." He found "no constitutional symptoms"; normal vital signs; normal "HEENT"; normal neck range of motion; tenderness of bi-occipital and upper trapezius regions; tenderness of rhomboid regions bilaterally; tenderness of chest wall anteriorly; no crepitation; normal range of motion throughout; normal muscle strength; no atrophy; no abnormal movements; no abnormal reflexes; normal deep tendon reflexes; normal gait; normal pelvis; normal "SI joint"; normal lumbosacral spine range of motion; a "little" tenderness at lumbosacral region and "SI joints"; normal lateral flexion and rotation; negative straight leg-raising test; negative Valsalva maneuvers; no spasms; no increased tone in extremities; clear lungs; and soft, non-tender, normal abdomen (R. 734).

Dr. Biundo assessed "likely fibromyalgia" and recommended myofascial therapy and pool therapy. He opined Plaintiff had "probably" reached maximal medical improvement (R. 735).

On April 28 and 30, and May 5, 12, 14, 19, and 26, 1998, Plaintiff received physical therapy from Affiliated Physical Therapy (R. 706-25).

On June 4, 1998, Dr. Calhoun completed a Fibromyalgia Residual Functional Questionnaire

of Plaintiff. To the question, "Does your patient meet the American Rheumatological criteria for Fibromyalgia?," Dr. Calhoun responded, "I am not familiar with these guidelines. Others have said she has this" (R. 697-98) Dr. Calhoun identified the following as Plaintiff's symptoms: multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, irritable bowel syndrome, numbness and tingling, lack of coordination, cognitive impairment, multiple trigger points, frequent severe headaches, TMJ dysfunction, and myofascial pain syndrome (R. 697-98). Dr. Calhoun noted Plaintiff's pain was located in her lumbosacral spine, cervical spine, and thoracic spine and that she experienced pain "everyday – sore points over much of body – different one bother [sic] her on different day [sic]." Dr. Calhoun opined Plaintiff's pain was precipitated by fatigue, movement and/or overuse, stress, cold, humidity, and static position. Dr. Calhoun opined he did "not believe" Plaintiff was malingerer (R. 698). Dr. Calhoun noted on the form that Plaintiff experienced emotional factors that contributed to her symptoms and limitations and that her physical and emotional impairments were consistent with her symptoms and limitations. Dr. Calhoun found Plaintiff's pain was frequently severe enough to interfere with her attention and concentration and that she exhibited a marked limitation in her ability to deal with work stress. Dr. Calhoun noted Plaintiff experienced drowsiness as a side effect to her medication. Dr. Calhoun found Plaintiff could walk two to three city blocks without resting or experiencing pain, but that this ability varied "from day to day." Plaintiff was found to be able to sit, stand, and/or walk for less than two hours and was found to be unable to work an eight-hour day (R. 699). Dr. Calhoun found Plaintiff needed to shift positions at will from sitting, standing, or walking; needed to lie down at unpredictable intervals; and could not tolerate prolonged sitting. Dr. Calhoun did not offer an opinion as to whether Plaintiff required the use of an assistive device, how much weight Plaintiff could carry, or

27

Plaintiff's limitations in reaching, handling, or fingering (R. 700). Dr. Calhoun found Plaintiff could not bend or twist at her waist and would have to be absent from work for more than three days per month. Dr. Calhoun opined Plaintiff's ability to work was affected by "pain, fatigue, mental sharpness." He found Plaintiff experienced headaches, migraines, sleep deprivation, morning stiffness, weakness, fatigue, reflux esophagitis, pelvic pain, speech difficulties, memory impairment, motor coordination problems, cramps, sensitivity to cold and humidity, leg cramps, muscle twitching, numbness, problems climbing stairs, lack of endurance, mood swings, irritability, and handwriting difficulties (R. 701).

Plaintiff received physical therapy on November 19, 1998, at United Rehab at AllenMed, located in Clarksburg, West Virginia (R. 247).

On November 20, 1998, Judy Starkey, Physical Therapist with United Rehab at AllenMed, corresponded with Dr. Calhoun, informing him that Plaintiff had received physical therapy at that clinic ten times. P.T. Starkey informed Dr. Calhoun Plaintiff would receive physical therapy "two to three times a week until she sees you for a follow-up" (R. 252).

On November 30, 1998, Dr. Calhoun corresponded with the Social Security Administration relative to Plaintiff's condition. He wrote that if Plaintiff were to be "retrained in a sedentary job, it would be very difficult for her to work on any sort of regular basis for more than a few minutes. Because of her pain and discomfort, she has to change position frequently or lie down. About the only place she could work would be out of her home at her own schedule. She continues to experience pain, exhaustion, and lack of ability to concentrate that preclude her working in almost any other work situation" (R. 737).

On December 1, 3, 8, 10, 15, 17, 21, and 29, 1998, and January 5, 1999, Plaintiff received

physical therapy at United Rehab at AllenMed (247, 253).

On January 12, 1999, Robert Harbert, Physical Therapist at United Rehab at Johnson Center, located in Bridgeport, West Virginia, corresponded to Susan Clark, R.N., about the Functional Capacity Evaluation he completed of Plaintiff on that date. His findings were summarized in a letter (R. 738). P. T. Harbert opined Plaintiff scored "high" marks for symptom magnification and could perform work at the sedentary level. P.T. Harbert found Plaintiff had decreased lumbar curve, normal thoracic curve, fair sitting and standing posture, no lateral shift, major movement restrictions in left lumbar flexion and extension, minimal limitations with cervical spine bending and rotation, tightness in shoulders bilaterally, strength of 4+/5 throughout all four extremities, no numbness in lower extremities, occasional numbness in fingertips, negative sitting straight leg raising test, anterior leg pain with dorsiflexion and knee extension, and positive supine straight leg raising (R. 739). P.T. Harbert did not conduct the Static Strength Testing and Material Handling Skills because of Plaintiff's "inability to tolerate the activity." Plaintiff reached "only . . . six times overhead before having increased pain" and she could "only bend and squat one time each." P. T. Harbert found Plaintiff could occasionally sit, stand and "use leg/arm controls" and could never bend, reach, climb, squat, kneel, walk, crawl, or balance (R. 740).

P. T. Harbert found Plaintiff had reached her maximum medical improvement and encouraged Plaintiff to "start a walking program, trying to gradually increase the duration and distance of the walk," as a most beneficial type of treatment for her condition (R. 740).

On January 20, 1999, Plaintiff received physical therapy from United Rehab at AllenMed (R. 253).

On January 26, 1999, P.T. Starkey wrote to Dr. Calhoun that Plaintiff had received physical

therapy at United Rehab at AllenMed for myofascial pain. According to P.T. Starkey, Plaintiff rated her pain at "5-6/10 on the Borg scale." P. T. Starkey noted Plaintiff had been trained in "modalities for pain control, as well as myofascial release, cardiovascular conditioning and range of motion exercises." Plaintiff was released from physical therapy (R. 246).

On March 23, 1999, Plaintiff reported to Simon McClure, M.D., for a psychiatric evaluation because her lawyer wanted her "to see a psychiatrist to find out any relationship between the injury, the fibromyalgia and . . . depression." Dr. McClure noted Plaintiff had done extensive Internet research about fibromyalgia. Plaintiff informed Dr. McClure her mood had not been good overall and that she experienced anhedonia, crying, poor sleep, poor energy and a fifty-pound weight gain, but no change in her appetite. Plaintiff informed Dr. McClure that she had "weird dreams"; "subtle cognitive difficulties subjectively"; "trouble with mathematics"; a tendency to reverse letters; and difficulty writing checks. Plaintiff stated she was "'suppose to be taking Prozac but I think I deliberately forget to take it.'" Plaintiff also informed Dr. McClure that she took Talwin, for which she did not have a prescription but which she obtains "'from someone who I would rather not mention'"; Tylenol with codeine, but not every day; Ambien; and Flexeril (R. 742). Plaintiff stated she had been taking thyroid medications in the past, but she "stopped it" (R. 743).

Dr. McClure's mental status examination of Plaintiff revealed she was slightly overweight; was in no acute physical or emotional distress; "did not seem to squirm around in pain"; had "fluid body movements"; was alert and attentive; was quiet and tired; was pleasant, cooperative, and consistent; was spontaneous without "dysarthia or aphasia"; was "oriented x4"; was able to register material; had some difficulty with short-term memory; performed "serial sevens" poorly; had no psychotic features; had no impulsive or dangerous thoughts; had good insight; had less than perfect

30

judgment; and had no obsessions or compulsions. Dr. McClure found the following diagnoses: Axis I – dysthymia and "[r]ule out mood disturbance from non -compliance with medications"; Axis II – deferred; Axis III – above mentioned medical issues; and Axis IV – above mentioned stressors (R. 743).

Dr. McClure discussed "management options" with Plaintiff, and it was agreed that Plaintiff would undergo a thyroid function test. He prescribed Cytomel 50micragrams and Celexa 20mg. He counseled Plaintiff on complying with medication usages as prescribed and avoiding using those medications prescribed to another individual (R. 743).

On August 19, 1999, Plaintiff was examined by Dr. Calhoun. She presented with point tenderness on the left proximal forearm. He assessed left arm pain and fibromyalgia. He prescribed Tylenol with codeine, Flexeril, and Ambien. He injected Plaintiff with Nubain and Vistaril (R. 297).

On September 1, 1999, Dr. Calhoun corresponded with Plaintiff's lawyer in response to the lawyer's letter to him dated August 25, 1999. He wrote Plaintiff experienced pain in her arms, back and neck, had experienced fatigue, and had been diagnosed with fibromyalgia. He noted Plaintiff was medicated with Tylenol with codeine, Flexeril, Ambien, Cytomel, and Celexa (R. 298, 745). Dr. Calhoun informed Plaintiff's lawyer that the injury she sustained at work was the "precipitating factor" to her condition and that Plaintiff had "developed discouragement and depression and . . . poor memory." Dr. Calhoun opined Plaintiff could not return to her work as a licensed practical nurse because "pain, variable fatigue and concentrating abilities would preclude this." Dr. Calhoun further opined that "[a]ny job that required [Plaintiff] to function at work for eight hours would be a burden [he did] not think she could bear and still do a good job." According to Dr. Calhoun,

Plaintiff would have to change positions frequently, have rest periods, and not work on some days. Dr. Calhoun noted it was "not possible" for Plaintiff to return to work at that time (R. 299, 746).

On September 14, 1999, Plaintiff's a prescription for Celexa and Cytomel was provided by Dr. Calhoun (R. 297).

On October 1, 1999, Plaintiff telephoned Dr. Calhoun's office to report Workers' Compensation denied payment approval of Celexa and Cytomel. Plaintiff stated "these have not seemed to help anyway." Plaintiff requested refill of her Tylenol with codeine prescription (R. 297).

On October 27, 1999, Joann Nullens, R.N., of Dr. Calhoun's office, reported Plaintiff had presented as an emergency with "severe episode of back pain." Nurse Nullens observed Plaintiff was in moderate distress with pain and she experienced "no particular tenderness, just . . . tender all over." Nurse Nullens administered Demerol 50mg and Vistaril 50mg "IM." Plaintiff requested "additional medication to take at home whenever she does have an acute episode of pain"; Nurse Nullens informed Plaintiff that providing additional medication for use at home was "difficult" because overuse can occur (R. 296).

On November 8, 1999, Dr. Calhoun prescribed Ambien and Tylenol with codeine to Plaintiff (R. 296).

On November 11, 1999, Plaintiff returned to Dr. Calhoun. He noted Plaintiff did not take her medications as prescribed on a regular basis, but that she questioned whether she needed to take medications daily. Plaintiff's low back was "sore," as were her hips. Plaintiff appeared to be "mildly depressed." Dr. Calhoun diagnosed fibromyalgia and prescribed Celexa 20mg, Nortiptyline 25mg, and Tylenol with codeine. Dr. Calhoun encouraged Plaintiff to do home physical therapy; specifically, he recommended stretching, posture exercises, and range of motion type activities (R.

295).

On January 7, 2000, Plaintiff presented to Dr. Calhoun with pain. Dr. Calhoun noted Plaintiff's pain levels increased and decreased. Plaintiff inquired about obtaining Oxycontin for use on a "prn basis." Plaintiff informed Dr. Calhoun she performed some household chores, prepared some meals, put laundry into the washing machine, and drove short distances. Plaintiff stated her using the hot tub helped "quite a bit" (R. 294). Dr. Calhoun recommended Plaintiff consult with a rheumatologist. He prescribed Oxy-IR, a form of Oxycontin (R. 293).

On January 27, 2000, Dr. Calhoun prescribed Oxy-IR to Plaintiff and advised her to ingest it when she was "only in extreme" pain (R. 293).

On February 7, 2000, Dr. Calhoun obtained an appointment for a consultative evaluation of Plaintiff by a rheumatologist, Dr. Antonilli, and Plaintiff agreed to attend the consultative evaluation (R. 293).

On March 7, 2000, Mark P. King, Physical Therapist at HealthWorks Rehab & Fitness, completed a Functional Capacity Evaluation of Plaintiff. P.T. King found that, since Plaintiff asserted she was "unable to perform the majority of the activities required by a Functional Capacity Evaluation, . . . an accurate PDC Level could not be determined." P.T. King found Plaintiff's physical demand capacity level was for "[s]edentary [l]ight" work. He found the following: 1) "[t]otal body pain which reportedly inhibits all activities"; 2) "[g]eneral decrease in overall physical status to include general flexibility, strength and endurance"; 3) "[a]pprehension with lifting activities"; 4) "[f]ear of accumulation factor"; and 5) [s]ome questionable degree of symptom magnification" (R. 254).

P. T. King recommended Plaintiff should "perform a low intensity exercise program as

tolerated"; should abandon physical therapy as past attempts failed to modulate her pain; and should undergo psychological counseling for chronic pain. P. T. King opined Plaintiff could not return to her previous work and that any job she would undertake "would need to require the ability to change positions frequently, and at her discretion, and allow her to work at a self-pace." P.T. King opined Plaintiff was capable of performing only the most "minimal of work activities," such as "simple paper handling, the answering of phones, and such activities" (R. 255). P. T. King noted it was "not doubted that [Plaintiff] is experiencing chronic pain, there were some indications that she may questionably be magnifying her symptoms to some extent, either consciously or unconsciously." P. T. King provided examples of inconsistencies demonstrated by Plaintiff during the Functional Capacity Evaluation that supported his observation (R. 256).

On March 8, 2000, Philip R. VanPelt, M.D., completed a Permanent Total Disability Evaluation form for the Workers' Compensation Division of the West Virginia Bureau of Employment Programs (R. 263). Dr. VanPelt's examination of Plaintiff revealed "near normal range of motion of the cervical spine, but these motions are performed very slowing [sic] and carefully" because Plaintiff asserted she experienced pain "at the extremes of the motions." Dr. VanPelt observed Plaintiff had full range of motion of her shoulders, elbows, and wrists, with "pain at the extremes of these motions." He found Plaintiff's "[g]ross sensation perception to soft touch [was] pretty much within normal limits." Dr. VanPelt found Plaintiff had tenderness in her posterior cervical musculature, interscapular musculature, trapezius musculature, over her shoulder, and in her lower back. Plaintiff demonstrated no "particular discomfort on circumferential pressure of her wrists" and she had negative compression, flexion and Tinel's signs in both wrists (R. 264). Plaintiff's combined back motion was nearly ninety degrees and she had negative straight leg raising

test in the sitting position to ninety degrees. Plaintiff's knee had full range of motion with some swelling. Dr. VanPelt's diagnosis was for chronic pain syndrome and possible fibromyalgia (R. 265).

Dr. VanPelt opined that Plaintiff's case was very "difficult" as her original injury was "relatively trivial." Dr. VanPelt noted Plaintiff could "pretty much do everything . . . [o]n an orthopedic examination," but Plaintiff reported pain. He deferred a "percentage impairment" to a rheumatologist or internal medicine specialist. Dr. VanPelt found Plaintiff could not return to her previous work and was "incapable of the normal performance of any job on a routine basis," which was permanent (R. 265).

On March 13, 2000, Plaintiff returned to Dr. Calhoun for an examination. She reported she had taken three Oxy-IR and two Flexeril doses "the other day when she was in bad pain." Plaintiff complained of pain in the back of her thighs and lower back. Plaintiff stated she was "a little bit better than she [had] been," except for her having felt fatigued. Plaintiff stated she used a TENS unit and did very little housework. Dr. Calhoun observed Plaintiff's low back was slightly tender and her straight leg raising test was normal. He diagnosed fibromyalgia and prescribed Celexa, Tylenol with codeine, Ambien, and Oxy-IR (R. 292).

On March 22, 2000, Plaintiff had a lipid profile completed. Dr. Calhoun noted on the report that her labs were "okay" (R. 291). Dr. Calhoun informed Plaintiff that her cholesterol was 225; her triglycerides were 270; and her HDL was 29 (R. 290).

On May 19, 2000, Melanie Merroto-Griffith, M.S., C.R.C., a vocational rehabilitation consultant with National Healthcare Resources, Inc., completed a Rehabilitative Assessment of Plaintiff (R. 269). Ms. Griffith reviewed several reports and records of evaluations and

examinations of Plaintiff (R. 270-71). Ms. Merroto-Griffith recommended Plaintiff proceed "with the vocation rehabilitation evaluation" as she was a LPN, had been enrolled in classes to obtain her registered nursing degree, and was of "average intelligence with post-high school reading and high school spelling level" (R. 272-73). Ms. Merroto-Griffith opined Plaintiff might have been "able to work as a medical claims manager for an insurance company" (R. 272).

On May 27, 2000, Plaintiff completed a Daily Activities Questionnaire (R. 193-97)[2]. The form read that Plaintiff rose at 6:30 a.m. or earlier and retired between 8:00 p.m. and 10:00 p.m.; could care for her personal and grooming needs; attempted to load the dishwasher; occasionally loaded clothes into the clothes washer and/or dryer; lay down during daily activities because of back and wrist pain; occasionally traveled as a passenger to the market; left the house approximately one hour per week; watched television; occasionally read magazines; visited her mother a couple times per year; and dined out one or two times per month (R. 193-96). It was noted on the form that Plaintiff could no longer shampoo and style her hair or apply makeup with regular frequency; Plaintiff's family prepared meals or she and her family ate out or carried pre-made food in; Plaintiff's family performed household chores; she experienced fatigue and sleeplessness and that she napped during the day; she had gained weight; she had difficulty getting along with others; she had difficulty concentrating, especially when calculating numbers or traveling in unfamiliar areas; and she had difficulty completing a chore or activity (R. 193-96). The form read that Plaintiff's ability to concentrate, complete tasks, or follow instructions had changed in that she "was 'A' student in school. Very good nurse, ran household, took care of 60 pts at work, and kids & hobbies but not

---

[2]This questionnaire was written in both first person and third person. On page 194 of the transcript (Exhibit B4E-2), it is written, "I (her husband) . . ." in response to a question. The undersigned, therefore, is uncertain as to who completed it.

since Fibro in 95" (R. 196).

Also on May 27, 2000, Roger A. Travis, Plaintiff's husband, completed a Personal Pain Questionnaire on behalf of Plaintiff. He noted Plaintiff's pain was located "from head to toe." He wrote Plaintiff had migraine headaches, pain between her shoulders, pain in her arm, pain in the palm of her hands, low back pain, severe spasms, hip pain, leg pain, foot pain, and knee pain. Mr. Travis noted Plaintiff experienced pain "[a]lways . . . somewhere to some degree" and that her pain was not in the same place all the time. Mr. Travis described the kind of pain experienced by Plaintiff as "[s]evere spasms in low back, stinging pains other areas, aching. Sharp stabbing pains." He reported Plaintiff's pain was a "4-5" on a scale of one-to-ten and that some days her pain was "10," which caused Plaintiff to cry and obtain an injection from the "doctor on call." Mr. Travis noted any activity caused Plaintiff's pain to elevate and that she had pain with no activity. He wrote that cold, damp weather; lifting; standing; sitting; and "laying" [sic] make Plaintiff's pain worse. Mr. Travis noted Plaintiff's pain was worse in the early morning and in the evening, the pain could last for several hours, and she always had pain to some degree. Mr. Travis wrote that Plaintiff's pain had changed during the past twelve months in that it "continues to worsen over time since 95. More pain, more intensity, more fatigue" (R. 198).

Mr. Travis noted Plaintiff was medicated with Tylenol with codeine, Flexeril, and Oxy-IR, but that "nothing totally relieves the pain." Mr. Travis wrote that, in addition to medicating her pain, Plaintiff treated her pain with the use of a TENS unit, hot tub, and heating pad, and that these treatments did not eliminate the pain but reduced it to a "tolerable level every day." Plaintiff's activities were limited, according to Mr. Travis, because activity increased Plaintiff's pain in her wrist, low back, and legs and increased her exhaustion. Mr. Travis wrote that "almost all" of

Plaintiff's activities were restricted or stopped because of her pain (R. 199).

On June 4, 2000, Dr. Calhoun completed a form relative to Plaintiff's impairments for the Division of Rehabilitation Services, Disability Determination Section (R. 287). He noted Plaintiff's range of motion of her affected joints were "usually okay"; she had pain in her lower back, upper back, and hips; she had no joint deformity; and Plaintiff had fibromyalgia, various tender points, depression, and fatigue. Dr. Calhoun opined that "[d]ue to Plaintiff's pain, great fatigue and depression, . . . [he did] not feel [Plaintiff could] . . . return to her work as LPN. She would have to have a sedentary job with very flexible hours & complete time off sometimes" (R. 288).

On June 13, 2000, Dr. Calhoun wrote to Plaintiff's counsel relative to her condition, stating Plaintiff had fibromyalgia, fatigue and depression; pain in her back, hips, feet, and neck; extreme fatigue; and poor memory and concentration. He opined Plaintiff's "problems [were] physical and mental." He noted Plaintiff complained of pain on palpation, but her fatigue, memory problems, and poor concentration conditions were "subjective symptoms self reported." Dr. Calhoun wrote he believed Plaintiff's subjective complaints and that her "problems" kept her from working (R. 286).

On June 19, 2000, Ms. Merroto-Griffith requested medical information from Dr. Calhoun so that vocational rehabilitative services could begin for Plaintiff (R. 351). This letter request was presented at the oral hearing (R. 3).

On June 19, 2000, Plaintiff presented to Dr. Calhoun for follow-up to her fibromyalgia. Plaintiff stated her wrist "hurt some but not as bad as other places usually do." Plaintiff informed Dr. Calhoun that fatigue was "a major problem" and that she did not sleep well. Plaintiff stated she did not "know how her memory" was, but she thought it was not "quite right and . . . it may be a little bit worse than it was." Plaintiff's appetite was good (R. 362). Dr. Calhoun noted Plaintiff's

knees had some point tenderness, her back was mildly tender, and her "Fundi" was normal. He assessed fibromyalgia and prescribed Celexa, Tylenol with codeine, Pamelor, Flexeril, Oxy-IR, and Ambien (R. 361). This record was submitted by Plaintiff's attorney in post development (R. 3).

On July 11, 2000, Charles Paroda, D.O., completed a consultative examination of Plaintiff. His written report was dated July 22, 2000 (R. 316). Dr. Paroda noted Plaintiff "had multiple vague complaints" and "would change the subject right in the middle of the discussion and sometimes would not answer questions and was somewhat evasive at times." Plaintiff informed Dr. Paroda that her condition consisted of the following: fibromyalgia, low grade temperature, no sore throats, no lymphadenopathy, fatigue, pain in eyes, whole body stiffness, whole back muscle pain, no trigger points, generalized tenderness, occasional swelling of her legs, no redness or warmth of her back, and plantar fasciitis (R. 316). Plaintiff provided a list of medications to Dr. Paroda, not the actual medications as instructed by him. The medication list read as follows: Flexeril, Tylenol with codeine, Ambien, Oxy-IR, Celexa, Pamelor, and Tagamet (R. 317).

Dr. Paroda's examination of Plaintiff revealed she was "significantly over weight" (R. 318). Dr. Paroda observed the following: Plaintiff's gait was normal; she was comfortable standing, sitting, and in supine position; her intellectual functioning and mental state were normal; and Plaintiff's HEENT, neck, cardiovascular, lung, chest, abdomen, spine, and neurological examinations were normal (R. 318-20). Dr. Paroda observed "some tenderness in spots" during examination of Plaintiff's extremities, but these spots "did not correspond to those required for fibromyalgia." He observed no redness, warmth, tenderness or swelling of any of her joints and no spasms in her muscles. Plaintiff had negative Tinel's and Phalen's signs. Dr. Pagoda opined Plaintiff's muscles and joints were normal. Dr. Pagoda also noted "[p]alpation of [Plaintiff's] . .

. shoulders, elbows, wrists, hands, hips, knees, ankles and feet reveals no swelling, tenderness, redness or warmth" (R. 319). His impressions were for myalgias/arthralgias; chronic fatigue by history; and "rule out somatization syndrome" (R. 320).

In his summary of his findings of Plaintiff's condition, Dr. Paroda noted Plaintiff "continuously changed the subject, especially when it came to specific questions concerning her signs and symptoms." He opined Plaintiff had "no tender spots or any redness, warmth, tenderness or swelling of any of her muscles or joints that would correspond with fibromyalgia or carpal tunnel syndrome" and "appeared to be normal without any significant fatigue." Dr. Paroda opined Plaintiff "may have psychological overlay concerning her symptomatology" and "a somatization type syndrome" (R. 320).

On July 12, 2000, Dr. Fremouw conducted a Psychological Consultative Examination of Plaintiff. Plaintiff stated the following as her chief complaints: "'I'm reapplying. I've been turned down. I have fibromyalgia. I have migraines. I have pain in my lower back, my shoulders, legs, and feet. It comes and goes. I get depressed. I cry. I'm fatigued. I'm agitated. I'm frustrated. I can't do things. I used to be very active.'" Dr. Fremouw observed Plaintiff "sat stiffly" and "never smiled." He noted Plaintiff was cooperative and had good social skills (R. 303).

According to Plaintiff, her physical symptoms were sleep disturbances because of pain, crying approximately one time per week due to pain and frustration, low energy level, irritable mood, and depression. Plaintiff stated she had a good appetite, was not suicidal, was not homicidal, had no phobias, had no panic attacks, and did not suffer from PTSD. Plaintiff informed Dr. Fremouw that she drove infrequently because her pain distracted her, causing her to experience concentration difficulties (R. 304). Dr. Fremouw's mental status examination of Plaintiff revealed her appearance

was clean and plain; her hair was stylish; her attitude was cooperative; her social skills were good; her speech was adequate; she was oriented times four; her mood was "'half-n-half, tired, and I ache,'" as per self-report; her affect was serious but appropriate; her thought processes were logical and coherent; her thought content was without delusions or obsessions; her insight was for decreased irritability because she took Celexa; she had no suicidal or homicidal ideation; her immediate, recent, and remote memories were within normal limits; she could recall three or four objects after a delay; her "concentration showed she could recall six digits forward and four backward"; she showed no psychomotor agitation, pacing or fidgeting; and she was very stiff (R. 305).

Plaintiff stated her subjective symptoms were as follows: "I cry. I'm irritable and frustrated. I'm in pain all the time. It comes and goes." Dr. Fremouw's objective symptoms were that Plaintiff took Celexa and Pamelor, pain medications, and sleep medication; Plaintiff had a "significant decrease in her adaptive functioning"; and Plaintiff had a decrease in pleasure and enjoyment (R. 305). Dr. Fremouw's diagnostic impression was for the following: Axis I – "[m]ood disorder due to physical condition, fibromyalgia – depressed type"; Axis II – no diagnosis; Axis III – fibromyalgia by self report (R. 305-06). Dr. Fremouw noted Plaintiff's prognosis was "guarded."

Plaintiff reported her activities of daily living were as follows: awakened between 7:00 a.m. and 10:00 a.m. by her children making "noise"; attempted "to pick up and do a few dishes"; spend much of her time sitting or lying down; drove very short distances; left the house once every two weeks; had difficulty falling asleep; and retired to bed between 7:00 p.m. and 3:00 a.m., depending on her pain. Plaintiff stated her children and husband completed household tasks: her husband shopped for groceries; her children did laundry; her husband cooked. Dr. Fremouw noted Plaintiff's social functioning was adequate: Plaintiff did not attend church, did not belong to any clubs, did not

41

visit neighbors, but Plaintiff's mother-in-law occasionally visited her. Dr. Fremouw found Plaintiff's concentration was within normal limits and that Plaintiff was capable of managing financial benefits (R. 306).

On July 18, 2000, Ms. Merroto-Griffith provided a Vocational Closure Report on Plaintiff to West Virginia Workers' Compensation Division. Ms. Merroto-Griffith reported Plaintiff reported to National Healthcare Resources, Inc., on December 10, 1999, for the purpose of completing a rehabilitation assessment. Ms. Merroto-Griffith received records of Plaintiff, and she completed Plaintiff's assessment on May 19, 2000. Ms. Merroto-Griffith opined Plaintiff "may benefit from vocational rehabilitation services" (R. 353). Ms. Merroto-Griffith reviewed the March 7, 2000, Functional Capacity Evaluation of Plaintiff and the updated opinions of Dr. Calhoun. She also reviewed the June 23, 2000, rehabilitation evaluation of Plaintiff, during which, according to Ms. Merroto-Griffith, Plaintiff "complained of severe, almost total body muscle pain" and "of frequent episodes of memory impairment and comprehension problems." Ms. Merroto-Griffith noted "[t]here was not medical evidence to substantiate her claims." Plaintiff, Ms. Merroto-Griffith noted, "declined to participate in vocational rehabilitation services"; thus, a neuropsychological evaluation was not pursued. Ms. Merroto-Griffith concluded the following: 1) "transferable skills analysis yielded job possibilities in the claimant's geographic area"; and 2) Dr. Calhoun found Plaintiff could work at sedentary or light work that "was at her home with a flexible work schedule." Plaintiff's file was closed (R. 354). This record was admitted at the oral hearing (R. 3).

On July 19, 2000, a state-agency physician completed a Psychiatric Review Technique of Plaintiff. The physician found Plaintiff had a non-severe medical impairment and affective disorders (R. 307). The physician found Plaintiff had a disturbance of mood, accompanied by a full or partial

manic or depressive syndrome, as evidence by her ". . . [m]ood . . . due to physical condition" (R. 310). This physician found Plaintiff had a slight degree of limitation in her activities of daily living and in her ability to maintain social functioning. It was found Plaintiff seldom experienced degrees of limitation in her ability to concentrate or in her persistence or pace. It was noted Plaintiff had never experienced an episode of deterioration or decompensation (R. 314).

On July 25, 2000, a state agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. The physician found Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations (R. 336-40). The physician found Plaintiff had normal physical exertional abilities and non-severe impairments (R. 341).

On August 24, 2000, a Reconsideration Disability Report was signed by Plaintiff and witnessed by Mr. Travis. On that form, Plaintiff noted she experienced increased fatigue, she was sleeping less, her pain was worse at times, her ability to comprehend was worsening, and her ability to drive was curtailed because she could not "remember a times what to do at lights." Plaintiff noted she was depressed because of constant pain, lack of sleep, and inability to do activities (R. 202).

On October 20, 2000, a Personal Pain Questionnaire was completed of Plaintiff by Mr. Travis. The responses to the questions on this form are similar to those found on the May, 2000, form (R. 208-09).

Also on October 20, 2000, a Daily Activities Questionnaire was completed by Plaintiff. It was noted Plaintiff retired between 8:00 p.m. and 10:00 p.m., but that she rose between 12:00 a.m. "(when can't sleep)" to 6:30 a.m. Plaintiff wrote she sometimes needed assistance with grooming and that her husband assisted her with her personal needs "when needed, but not" frequently (R. 210). Plaintiff noted her family prepared meals. Plaintiff wrote she sometimes laundered clothes

and loaded the dishwasher (R. 211). Plaintiff noted she accompanied her husband to the grocery store one or two times per month and seldom went anywhere. According to Plaintiff, her husband drove her because she got "lost easily & due to pain." Plaintiff noted she watched television "off & on most of day" (R. 212). Plaintiff wrote she visited her mother at holidays, usually did not receive any visitors, and traveled to the doctor's office every two or three months. Plaintiff asserted she "constantly" had difficulty concentrating, had difficulty finishing activities, and had difficulty following written or spoken instructions (R. 213).

On October 24, 2000, Plaintiff presented to Dr. Calhoun with a "big headache," which was in her upper back, neck, top of her head, and into her jaw. Plaintiff had treated her headache with Tylenol with codeine and Oxy-IR. Plaintiff stated she used her home TENS unit and hot tub for pain. Plaintiff informed Dr. Calhoun that her fatigue was "up and down" and her memory was about the same. Dr. Calhoun's examination of Plaintiff revealed normal Fundi and tenderness on the right side of neck. Dr. Calhoun diagnosed Cephalgia and fibromyalgia and injected Plaintiff with Demerol 100mg and Vistaril 50mg. He instructed Plaintiff to continue her other medications as prescribed. Plaintiff drove home (R. 360). This record was submitted by Plaintiff's attorney in post development (R. 3).

On November 9, 2000, James Capage, Ph.D., a state agency source, completed a Psychiatric Review Technique Form of Plaintiff. Dr. Capage found Plaintiff had a non-severe medical impairment and affective disorder (R. 322). Dr. Capage found Plaintiff had a medically determinable impairment in the form of a mood disorder due to physical conditions (R. 325). Dr. Capage found Plaintiff had a mild degree of limitation with regard to her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace. Dr.

Capage found Plaintiff had not experienced repeated episodes of decompensation (R. 332).

On November 13, 2000, Dr. Fulvio R. Franyutti reviewed the July 25, 2000, findings of the state-agency physician relative to Plaintiff's physical residual capacity functioning and affirmed them (R. 343).

On January 18, 2001, Plaintiff presented to Dr. Calhoun with hip and low back pain, leg swelling, and decreased activity. Plaintiff stated she felt worse in the winter because of the cold. Plaintiff informed Dr. Calhoun that her memory fluctuated. Plaintiff used her hot tub and TENS unit. Dr. Calhoun's examination of Plaintiff revealed tenderness in her thighs and low back. He prescribed Flexeril, Ambien, and Oxy-IR (R. 359). This record was submitted by Plaintiff's attorney in post development (R. 3).

On January 24, 2001, Plaintiff requested Dr. Calhoun renew her prescription for Tylenol with codeine. He complied with this request (R. 359). This record was submitted by Plaintiff's attorney in post development (R. 3).

Medical Evidence Post-Dating Plaintiff's Date Last Insured

On May 3, 2001, Plaintiff returned to Dr. Calhoun with complaints of high blood pressure. Her blood pressure was 180/100. Dr. Calhoun diagnosed hypertension and prescribed Heparan, Oxy-IR, and Tylenol with codeine (R. 359). This record was submitted by Plaintiff's attorney in post development (R. 3).

At the request of her lawyer, Plaintiff was evaluated by Lisa J. Jenkins, M.S., C.R.C., L.P.C., on May 8, 2001. Ms. Jenkins provided Plaintiff's lawyer with a Vocational Assessment of Plaintiff on June 5, 2001 (R. 220). This report was provided by Plaintiff's attorney in post development (R. 2). Plaintiff informed Ms. Jenkins she drove short distances, watched television, visited with

relatives, completed "some" laundry chores, unloaded the dishwasher, and cooked "a little" (R. 220). Ms. Jenkins reviewed the medical records provided (R. 222-24). Plaintiff informed Ms. Jenkins she experienced chronic pain in her back, shoulders, legs, hips, both arms, hands, ankles, and feet, which was often severe and which worsened with activity and stress. Plaintiff stated she experienced difficulty sleeping and felt fatigued. Plaintiff informed Ms. Jenkins her memory, concentration, and sleeping patterns had been affected by her pain. Plaintiff asserted she felt depressed, had crying spells, and had lost interest in activities (R. 224). Ms. Jenkins reviewed the medications and methods Plaintiff used for treatment of her condition (R. 224-225).

Ms. Jenkins reviewed the opinions of vocational professionals as follows: P.T. Harbert, who opined Plaintiff "could not work at even the sedentary exertional level"; Ms. Clark, who "recommended scheduling a vocational evaluation and looking for alternative types of employment" for Plaintiff"; Ms. Clark, who opined Plaintiff was unable to perform heavy, exertional work; Ms. Clark, who noted she was "unsure" if Plaintiff could return to work but would benefit mentally from working; and Ms. Clark, who suggested establishing "'re-employment possibilities . . . with [Plaintiff's] . . . preinjury employer'" (R. 225). Plaintiff informed Ms. Jenkins that a vocational professional had suggested she "do a telemarketing job which involved making at least 100 calls per day from the [Plaintiff's] home," but that Plaintiff was not told what her salary would be. Subsequent to this, Plaintiff's vocational rehabilitation case was closed. Additionally, Ms. Jenkins considered the findings of Ms. Merroto-Griffith (R. 226). Ms. Jenkins concluded Plaintiff was unable to return to her "customary work or to other substantial, gainful activity for which she is suited by experience, training, or existing skills or abilities" (R. 227-28). Ms. Jenkins further concluded Plaintiff could not be "successfully rehabilitated or retrained for alternative employment"

46

(R. 228).

On May 14, 2001, Dr. Calhoun corresponded with Plaintiff's lawyers relative to Plaintiff's condition. He wrote Plaintiff experienced "pain in various places, insomnia, and fatigue and poor memory." He opined Plaintiff could not "effectively do her work as an LPN with these problems." He informed Plaintiff's lawyers that "[n]o further consultations are contemplated at this time" (R. 357). This record was submitted by Plaintiff's attorney in post development (R. 3).

On July 18, 2001, Dr. Calhoun refilled Plaintiff's prescriptions for Tylenol with codeine, Ambien, Oxy-IR, Celexa and Flexeril (R. 749).

On September 26, 2001, Dr. Calhoun issued a refill for Plaintiff's prescription for Tylenol with codeine (R. 749).

On November 5, 2001, Plaintiff presented to Dr. Calhoun for refills of her medications and because her "[l]awyers [were] asking for a more detailed report on condition for Social Security." Dr. Calhoun noted Plaintiff was "not good at taking her meds – everyday . . . ." Plaintiff stated she experienced pain between shoulders, in her low back, and in her feet. Plaintiff informed Dr. Calhoun that she occasionally experienced "problems" with her wrist in that it was difficult for her to open jars. Plaintiff stated she usually slept "pretty well often" without "any meds." Plaintiff asserted her "fatigue level was a lot better in summer." Plaintiff stated she used the hot tub. Plaintiff informed Dr. Calhoun that she could "go out" and could "find where she's going" and that she had a computer, which she used "some." Dr. Calhoun's examination of Plaintiff revealed her back was tender, but not her low back; normal hands; leg and arm sensations were "ok"; and "Fundi ok." Dr. Calhoun assessed fibromyalgia (R. 748).

On November 12, 2001, Plaintiff reported to Dr. Calhoun she experienced low back pain and

was unable to sleep. Plaintiff informed Dr. Calhoun she had taken Tylenol with codeine, Oxy-IR, and Flexeril medications, which "only relieve[d] [symptoms] for a short period." Dr. Calhoun assessed low back pain and prescribed Tylenol with codeine and Flexeril (R. 747).

On January 10, 2002, Plaintiff presented to Dr. Calhoun with increased back spasms. Plaintiff stated she was too fatigued to exercise and left the house "about once a week" (R. 772). Dr. Calhoun noted Plaintiff was experiencing stress because she was "applying for social security." Plaintiff's blood pressure was 162/94, which Dr. Calhoun attributed to emotional stress. Dr. Calhoun observed Plaintiff's back was "not generally tender but . . . [had] tender points in it." He prescribed Celexa 40mg and Skelaxin 800mg (R. 771).

On February 4, 2002, B. G. Thimmappa, M.D., completed a consultative examination of Plaintiff for West Virginia Disability Determination Services. Plaintiff informed Dr. Thimmappa that she had multiple tender points, multiple trigger points, fatigue, headaches, low back pain, high blood pressure, and acid reflux (R. 750-51. Plaintiff stated she could stand for not more than ten or fifteen minutes and could not carry more than five pounds (R. 750).

Dr. Thimmappa opined Plaintiff's HEENT, cardiovascular, respiratory, gastrointestinal, and genitourinary examinations were normal. Plaintiff walked with a normal gait, walked on her heels and toes, and wrote and picked up coins (R. 751). Dr. Thimmappa found Plaintiff's neck, chest, lungs, heart, abdomen, extremities, neurological system, musculoskeletal system, and joints were normal examinations. Dr. Thimmappa noted Plaintiff had spasm of her lumbar muscles and that her flexion movement of her thoracic and lumbosacral spine were slightly restricted, but her curvature was normal, movements of her cervical spine were normal, and her lateral bending was normal (R. 752).

48

Dr. Thimmappa's impression was for history of fibromyalgia and hypertension (R. 752). Dr. Thimmappa noted the only medical record made available for his review was one dated January 18, 2001, which read Plaintiff had fibromyalgia and slightly elevated blood pressure (R. 753).

Dr. Thimmappa's attached a Medical Source Statement of Ability to do Work-Related Activities (Physical) to his evaluation of Plaintiff. He found Plaintiff could occasionally lift and/or carry ten pounds; stand and/or walk less than two hours in an eight-hour workday; sit less than about six hours in an eight-hour workday; and push/pull limited in upper and lower extremities (R. 755-56). Dr. Thimmappa found Plaintiff was occasionally limited in her ability to climb, balance, kneel, and crouch. Dr. Thimmappa found Plaintiff should never crawl or stoop (R. 756). Dr. Thimmappa found Plaintiff had no manipulative, visual or communicative limitations (R. 757). Dr. Thimmappa found Plaintiff was limited in her exposure to noise, humidity, wetness, and hazards; he found Plaintiff was unlimited in her exposure to dust, vibration, fumes, odors, chemicals, and gasses (R. 758). Plaintiff's counsel objected at the administrative hearing to Dr. Thimmappa's evaluation report and Medical Source Statement being entered into the record (R. 242-45, 785-86).

On February 15, 2002, Psychologist Martin Levin, M.A., completed a Psychological Evaluation of Plaintiff. Plaintiff stated she had fibromyalgia, fatigue, and pain. Plaintiff informed Mr. Levin that her appetite was average, she had difficulty rising in the mornings, she experienced difficulty concentrating, she experienced decreased attention, and her mood was sad. Plaintiff informed Mr. Levin that she took Ambien for sleep and Celexa for depression. Mr. Levin reviewed the July 12, 2002, report of Dr. Fremouw (R. 760).

Mr. Levin observed Plaintiff had appropriate grooming, was cooperative and pleasant, made good eye contact, behaved in a socially appropriate manner, had adequate communication skills, was

49

oriented times four, had depressed mood, had mildly constricted affect, had good insight, had normal judgment, had average immediate and recent memory, had normal remote memory and concentration, and her psychomotor behavior was within normal limits (R. 761). On the WAIS-III, Plaintiff's Verbal IQ was 94; Performance IQ was 86; and Full Scale IQ was 91 (R. 761-62). On the WRAT-III, Plaintiff scored as follows: reading – post-high school; spelling – post- high school; arithmetic – high school (R. 762).

Mr. Levin found the following diagnosis: Axis I – mood disorder due to physical condition, depressed type; Axis II – no conditions; Axis III – fibromyalgia by self report of Plaintiff. He found her prognosis was good (R. 763). Mr. Levin found Plaintiff's persistence, immediate memory, recent memory, and remote memory were average. He opined Plaintiff could manage financial affairs (R. 763).

Plaintiff listed the following activities of daily living: rose between 7:00 a.m. and 8:00 a.m.; readied her children for school; attempted to "pick up"; attempted to wash "a few dishes"; attempted to clean; spent "a great deal of time simply lying on the couch"; completed "very little housework"; drove short distances; watched television; and retired between 7:00 p.m. and 3:00 a.m. Plaintiff stated she was not very active during the day or evening and that her husband shopped for the household. Plaintiff informed Mr. Levin that she had very little social activity, did not attend church, and did not participate in social organizations (R. 763).

In conjunction with the Psychological Evaluation of Plaintiff, Mr. Levin also completed a Medical Course Statement of Ability to do Work-Related Activities (Mental) of Plaintiff. He found Plaintiff's ability to understand, remember, and carry out instructions were not affected by her impairment (R. 764). Mr. Levin opined Plaintiff was slightly restricted in her ability to interact

appropriately with public, interact appropriately with supervisors, interact appropriately with co-workers, respond appropriately to work pressures, and respond appropriately to changes in a routine work setting. Mr. Levin found Plaintiff's ability to do physical labor was affected by her impairment as it exacerbated her pain. He based this assessment on Plaintiff's report (R. 765). Plaintiff's counsel objected at the administrative hearing to Mr. Levin's evaluation report and Medical Source Statement being entered into the record (R. 242-45, 785-86).

On February 28, 2002, Dr. Calhoun prescribed Skelaxin, Celexa, Tylenol with codeine, and Oxy-IR to Plaintiff (R. 771).

On July 5, 2002, Plaintiff presented to Dr. Calhoun for a follow-up examination for fibromyalgia. Dr. Calhoun noted Plaintiff was denied Social Security benefits. Plaintiff informed Dr. Calhoun that her knees hurt when she climbed stairs; he did not observe swelling. Plaintiff asserted her ankles "bother[ed]" her occasionally, but her wrist was not "a great problem." Plaintiff stated her thinking was "sometimes clear – sometimes not." Plaintiff informed Dr. Calhoun that her daily activities included using the dishwasher and folding clothes. Plaintiff stated that, if she exerted herself, she felt tired. Dr. Calhoun diagnosed fibromyalgia and prescribed Ambien and Skelaxin (R. 770).

On August 6, 2002, Dr. Calhoun prescribed Pamelor to Plaintiff (R. 769).

On August 20, 2002, Plaintiff presented to the Emergency Department of the United Hospital Center with upper back, neck and head pain (R. 774). Plaintiff was diagnosed with a headache (R. 776-77). Plaintiff was prescribed no medication and discharged on that date (R. 778).

On November 22, 2002, Dr. Calhoun prescribed Oxy-IR, Tylenol with codeine, and Celexa to Plaintiff (R. 769).

On February 3, 2003, Plaintiff returned to Dr. Calhoun with complaints of her left arm and leg "giving her a lot [sic] of trouble" and a request for prescriptions for her medications (R. 769). Dr. Calhoun's examination revealed Plaintiff's arm and leg were not tender to palpation. Dr. Calhoun provided Plaintiff with prescriptions for Ambien, Celexa, Oxy-IR, Pamelor, and Tylenol with codeine. Plaintiff was given a Nubain injection (R. 768).

On February 13, 2003, Plaintiff reported she experienced soreness at the Nubain injection location. Dr. Calhoun instructed Plaintiff to apply heat and massage the area (R. 767).

On May 16, 2003, Dr. Calhoun provided prescriptions for Oxy-IR to Plaintiff (R. 767).

On June 12, 2003, Plaintiff presented to Dr. Calhoun for her Workers' Compensation "check up." He reviewed Plaintiff's medications, which included Ambien, Oxy-IR, Tylenol with codeine (R. 766).

October 29, 2003, Administrative Hearing

At the administrative hearing, a medical expert, Robert Marshall, M.D., testified. He stated the following: "The diagnosis of fibromyalgia is very difficult. . . . [S]ome people have said yes, this may be fibromyalgia, but what I read with the – not with any great enthusiasm and doctors always like to come up with some diagnosis, so I think this is a diagnosis by exclusion. She doesn't have evidence of anything else. And so someone says that this is probably fibromyalgia." Dr. Marshall reviewed the evidence provided by Dr. Morehead, which contained an opinion that Plaintiff did not "fit the criteria" for fibromyalgia (R. 795). Dr. Marshall testified Plaintiff "does have problems. She doesn't feel well. She is convinced that her symptoms have resulted from the physical injury way back then. I really – I can't elucidate the fibromyalgia any more other than it's there. It's a term used where nothing else fits" (R. 796). Dr. Marshall opined he believed Plaintiff's condition

52

pointed to a somatoform disorder (R. 796-97). Dr. Marshall testified he believed Plaintiff had "problems," but he found it difficulty "to come up with any physical diagnosis" on which he could "stand" (R. 797). Dr. Marshall opined Plaintiff had plantar fasciitis which would cause difficulty for her to climb, operate machinery that required foot control, or walk on irregular surfaces (R. 797-98). Dr. Marshall testified Plaintiff should experience "no difficulty with the wrist" (R. 798). Dr. Marshall testified that he believed Plaintiff was "probably unfit to work, and in my opinion that would be more on the basis of her psychological symptoms, which certainly seem to be associated with the condition that's been called fibromyalgia. But if you're asking me can I say that she meets or equal [sic] a listing for complete disability from fibromyalgia . . . I have to say no" (R. 808).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Slahta made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through March 31, 2001.

2. The claimant did not engage in substantial gainful activity at any time from December 8, 1995 through March 31, 2001.

3. For a period of at least 12 consecutive months during the period from December 8, 1995 through March 31, 2001, the claimant had fibromyalgia, a severe, medically determinable impairment (20 CFR § 404.1521).

4. During the period from December 8, 1995 through March 31, 2001, the claimant had no medically determinable impairments, whether considered individually or in combination, that presented symptoms sufficient to meet or equal the severity criteria of any impairment listed within Appendix 1, Subpart P, Regulation No. 4.

5. The claimant's allegations regarding her impairment-related limitations, as purported to exist during the period from December 8, 1995 through March 31, 2001, are not fully credible.

6.    From December 8, 1995 through claimant [sic] March 31, 2001, the claimant had the residual functional capacity to perform at least a range of entry level, unskilled, low stress work that: requires no more than a sedentary level of physical exertion; affords the option to sit or stand; consists of routine or repetitive tasks requiring no more than one- or two-step instructions; and primarily entails working with things rather than people (20 CFR § 404.1567).

7.    At all times from December 8, 1995 through March 31, 2001, the claimant was unable to fully perform the requirements of any of her past vocationally relevant work (20 CFR § 404.1565).

8.    The claimant is considered as a "younger individual" (20 CFR § 404.1563).

9.    The claimant has "more than a high school education" (20 CFR § 404.1564).

10.   Transferability of previously acquired work skills is not an issue (20 CFR § 404.1568).

11.   Although the claimant had impairment-related limitations that precluded her ability to perform the full range of even sedentary work from December 8, 1995 through March 31, 2001, using Medical-Vocational Rule 201.28 as a framework for decision-making, there are a significant number of appropriate jobs in the national economy that she remained able to perform. Examples include work bench worker (5,100 regionally/103,000 nationally), hand packer (2,000 regionally/58,000 nationally) and surveillance system monitor (1,900 regionally/97,000 nationally).

12.   The claimant was not under a "disability," as defined in the Social Security Act, at any time from December 8, 1995 through March 31, 2001 (20 CFR § 404.1520(f)) (R. 44-45).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court

disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1.    The ALJ's credibility findings are wholly improper, unfair and unsupported by the record.

2.    The ALJ erred by affording no weight to a number of medical and vocational opinions because the opinions included consideration of the Plaintiff's symptoms.

The Commissioner contends:

1.    Substantial evidence supports the ALJ's evaluation of the medical evidence and opinions of record.

2.    Substantial evidence supports the ALJ's determination regarding the credibility of Plaintiff's subjective complaints.

### C. Credibility

Even though Plaintiff did not argue the ALJ failed to apply appropriate Fourth Circuit case

law or follow appropriate Social Security regulations in analyzing Plaintiff's credibility, Plaintiff

does contend, in her "Summary of Argument," that the ALJ's credibility findings are wholly

improper, unfair and unsupported by the record. (Plaintiff's brief at p. 5.) Defendant argues that

substantial evidence supports the ALJ's determination regarding the credibility of Plaintiff's

subjective complaints. (Defendant's brief at p. 18.)

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor

and to determine the credibility of the claimant, the ALJ's observations concerning these questions

are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984) (*citing Tyler v.*

*Weinberger*, 409 F.Supp. 776 (E.D.Va.1976)). The ALJ, in the instant case, had the opportunity to

observe the demeanor and determine the credibility of Plaintiff on two separate occasions – the May

16, 2001, and December 26, 2001, administrative hearings at which Plaintiff testified – and the

decision he subsequently rendered (R. 76-132, 814-49). (Plaintiff's brief at p. 3.) The ALJ's

opinions relative to Plaintiff's credibility, are, therefore, assigned great weight by the undersigned.

The Fourth Circuit has developed a two-step process for determining whether a person is

disabled by pain or other symptoms as announced in *Craig v. Chater*, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically
> determinable impairment which could reasonably be expected to cause not just pain,
> or some pain, or pain of some kind or severity, but *the pain the claimant alleges she*
> *suffers*. The regulation thus requires at the threshold a showing by objective
> evidence of the existence of a medical impairment "which could reasonably be
> expected to produce the actual pain, in the amount and degree, alleged by the
> claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A)
> requires "objective medical evidence of some condition that could reasonably be
> expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective
> medical evidence a medical impairment reasonably likely to cause the pain claimed,
> *that the intensity and persistence of the claimant's pain, and the extent to which it*
> *affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) &

404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig, supra* at 594.

The undersigned finds the ALJ fully complied with the first threshold step in *Craig*, finding the medical evidence showed Plaintiff had medically determinable impairments reasonably likely to produce some of the symptoms she described (R. 38). The ALJ was, therefore, required to go on to the second step in *Craig*.

The Plaintiff asserts, in her ""Summary of Argument," the ALJ "attacked every aspect of [Plaintiff's] character" by finding 1) Plaintiff had "used her medical training and her research capabilities to manufacture the appropriate symptoms to match her diagnosis"; 2) Plaintiff had "falsified application documents to appear more disabled"; 3) Plaintiff "attributed her reports of pain to a secondary gain motivation"; 4) Plaintiff had submitted "highlights and notes about her symptoms on informative articles about fibromyalgia" which "were intentionally designed to be misleading"; and 5) Plaintiff had "intentionally made her condition worse by not following the doctor's exercise recommendations because 'engaging in such activities might be construed as inconsistent with a claim of disability.'" (Plaintiff's brief at p. 5.) The undersigned finds the ALJ, in assigning credibility to Plaintiff, analyzed these facts, which included literature submitted by Plaintiff, Plaintiff's extraneous handwritten notes on various documents in the record of evidence, Plaintiff's submitted journal entries, the discrepancies in various forms completed by Plaintiff and/or

57

Plaintiff's husband, and letters written by Plaintiff (R. 25, 27, 28, 29, 20, 31, 32, 33, 34, 35). A review of the ALJ's decision, however, shows he considered all the second-step factors and not just the above stated elements. The ALJ weighed and considered Plaintiff's allegations that her "ability to think clearly continued to worsen"; she reversed numbers and could no longer pay her bills; her thought process was problematic; she read little because she became sidetracked; she could sometimes lift a jug of milk; she could not concentrate to read; she experienced handwriting difficulties; she could not concentrate; she had difficulty comprehending; she forgot what to do at stoplights; she became lost in familiar places; she forgot her children's ages and birthdays; she slept for only three hours each night; she had nightmares; physical therapy made her condition worse; massage helped her condition; "plantar fasciitis foot pain was related to fibromyalgia and that it felt like every bone in her foot was broken"; she occasionally cooked; she swept the floor; she put laundry items in the washer; she received no relief from prescribed medications; her entire body was impacted with pain; and she experienced twelve symptoms that were "generally attributable to fibromyalgia," such as fatigue, weakness, exhaustion, dry eyes, migraine headaches, irritable bowel syndrome, bladder problems, difficulty grasping, need to change position due to pain (R. 28, 37-38). He considered and discussed these statements of Plaintiff about her pain and limitations in relation to the below-listed evidence of record, which includes Plaintiff's medical history, medical signs and laboratory findings, objective medical evidence relative to Plaintiff's pain, Plaintiff's activities, and medical treatment recommended to alleviate her symptoms:

1. July 1995 speculation of Dr. Guberman as to the possibility that Plaintiff had "'post-traumatic fibromyalgia'" or early inflammatory arthritis and his referral of Plaintiff to Dr. Caplan, a rheumatologist, for a definite diagnosis (R. 33).

2. November 1995 diagnosis by Dr. Caplan, a rheumatologist, of autonomic dysfunction and myofascial pain syndrome and not a diagnosis of fibromyalgia as

claimed by Plaintiff in October 1997 (R. 32).

3.      March 1996 opinion of Dr. Garvin that he "would be hard pressed to diagnose [Plaintiff] with any specific pain disorder, as her laboratory work was essentially normal" (R. 38).

4.      April 1996 notation by Dr. Garvin that Plaintiff had been prescribed Darvocet and had exceeded the prescribed dosage, thereby "prematurely" using her supply (R. 36).

5.      May 1996 opinion of Dr. Davis that Plaintiff was in "'good health'" relative to her intent to pursue an associate nursing degree (R. 33).

6.      May 1996 observation by Dr. Garvin that Plaintiff had telephoned the clinic between appointments seeking additional prescriptions for narcotics and had taken three Talwin narcotic pills, which she obtained from her brother-in-law. Dr. Garvin informed Plaintiff he was uncomfortable prescribing Darvocet to her without a diagnosis and recommended Plaintiff seek care from another doctor. Dr. Gavin "observed [Plaintiff's] hair and makeup to be 'obviously well manicured' and applied, which he indicated as incompatible with [Plaintiff's] alleged symptoms" (R. 36, 38).

7.      September 1996 diagnosis of Dr. Morehead of diffuse pain syndrome from a trivial injury and his opinion that Plaintiff's "'symptoms did not fit the classical trigger point requirements'" for fibromyalgia (R. 34).

8.      November 1996 observations of Dr. Patel that Plaintiff had 5/5 strength, had no signs of atrophy, could squat and rise, could walk on heels and toes, and had normal gait. He diagnosed "'questionable fibromyalgia'" and recommended Plaintiff be evaluated by a rheumatologist (R. 39).

9.      January 1997 opinion of state agency physician that Plaintiff could perform medium work (R. 39).

10.     Dr. Calhoun did not diagnosis fibromyalgia but offered an opinion in February 1997 that Plaintiff had received a "'diagnosis of fibromyalgia'" from other physicians. Dr. Calhoun noted he was not an expert on fibromyalgia and that experts who had treated and/or evaluated Plaintiff disagreed "'in their assessment' as to [Plaintiff's diagnoses" (R. 32-33).

11      April 1997 opinion of state agency physician that Plaintiff could perform medium work (R. 39).

12.     May 1997 diagnosis of fibromyalgia by Dr. Gade, who observed Plaintiff was in no acute distress, had normal strength, had normal range of motion and who advised

Plaintiff to be actively involved in her rehabilitation program by walking daily and beginning a physical therapy program (R. 34).

13. July 1997 opinion of Dr. Fichter that Plaintiff was temporarily totally disabled (not totally disabled as asserted by Plaintiff in 1998) and that Plaintiff could "return to the work force once her medications had been tailored to meet her needs" (R. 35).

14. September 1997 diagnosis of exacerbation of fibromyalgia by Dr. Djuric, Dr. Gade's medical partner, who noted Plaintiff "'really does need to follow through with the aggressive, multi-faceted rehabilitation approach outlined by Dr. Gade'" (R. 34).

15. March 1998 consultative psychological evaluation by Dr. Fremouw, in which Plaintiff's activities of daily living, social functioning, and concentration and pace were found to be no more than mildly impaired and her memory was found to be intact (R. 23).

16. April 1998 opinion of Dr. Calhoun that Plaintiff could be trained for sedentary work (R. 39).

17. June 1998 fibromyalgia residual functional capacity questionnaire completed by Dr. Calhoun, in which he noted Plaintiff could not complete an eight-hour workday, an opinion which contradicted his April 1998 finding that Plaintiff could perform sedentary work. Dr. Calhoun did note that he "was unfamiliar with the guidelines of the American Rheumatological criteria for fibromyalgia but that 'others' had said [Plaintiff] had it" (R. 39).

18. March 1999 psychiatric evaluation, at which Plaintiff stated she was suppose to be taking Prozac, but "deliberately forgot" to take it. Plaintiff was found to be in no acute emotional or physical distress; to be pleasant, cooperative, alert, interested, and attentive; to have good insight; to have less than perfect judgment; to have some difficulty with short term memory (R. 23).

19. March 1999 statement by Plaintiff to psychiatrist that her medications included Talwin, "which she got 'from someone who [she] would rather not mention'" (R. 36).

20. October 1999 request of Plaintiff to Dr. Calhoun for "'additional medication' [to keep] on hand at home for whenever she had an 'acute' episode of pain," which was denied by the doctor (R. 36).

21. November 1999 recommendation by Dr. Calhoun that Plaintiff stretch, do posture exercises, and perform range of motion type activities to treat her symptoms (R. 36).

22. January 7, 2000, suggestion by Plaintiff that she be prescribed narcotics to take "on

an 'as needed' basis"; on January 27, 2000, Dr. Calhoun prescribed Oxy/R for Plaintiff to take "'when the other measures at her command' were not doing the job" (R. 36).

23.    On February 7, 2000, Dr. Calhoun urged Plaintiff to seek the care of a rheumatologist (R. 36).

24.    March 2000 opinion of Dr. VanPelt that Plaintiff had chronic pain syndrome and that she could "'pretty much do everything it is just painful for her.'" Dr. VanPelt deferred an assessment of Plaintiff's impairment to a rheumatologist (R. 40).

25.    June 13, 2000, diagnosis by Dr. Calhoun that Plaintiff had poor memory and poor concentration, but these "'subjective symptoms [were] self-reported'" (R. 24).

26.    June 2000 opinion by Dr. Calhoun that Plaintiff could not return to her past work but could perform sedentary work with flexible hours (R. 39).

27.    June 19, 2000, opinion by Dr. Calhoun that Plaintiff "should continue exercise at home, medication and hot tub use'" (R. 40).

28.    July 12, 2000, consultative mental status examination, at which Plaintiff was found to have normal judgment, concentration, and memory (R. 23).

29.    July and November 2000 reports by state agency psychologists that Plaintiff had no severe impairments and was capable of a full range of work (R. 24).

30.    July and November 2000 opinions by state agency physicians that there was no objective evidence of any exertional or nonexertional limitation to Plaintiff and that she could perform a full range of work (R. 40).

31.    July 2000 notation by Dr. Paroda during his consultative physical examination of Plaintiff that she was "vague and evasive," avoided answering questions, ambulated normally, was comfortable standing/sitting/supine, did not appear fatigued, and presented with some "'myalgias and arthralgias'" that did not "'correspond with what is typically found in fibromyalgia or chronic fatigue'" (R. 24, 40).

32.    May 2001 response of Dr. Calhoun to Plaintiff's lawyer that Plaintiff could not do her past work as a licensed practical nurse (R. 41).

33.    February 2002 finding of Mr. Levin that Plaintiff's judgment, memories, behavior, and concentration were either "average, good or otherwise within normal limits" and that Plaintiff's activities of daily living included "pick[ing] up around the house," doing a little housework, doing dishes, driving, reclining on the couch, and watching

television. Mr. Levin diagnosed Plaintiff's mood as depressed and noted Plaintiff's prognosis was good (R. 25, 41).

34.  February 2002 observations by Dr. Thimmappa that Plaintiff experienced lumbar muscle spasms, normal movement of cervical spine, slightly restricted movement of her thoracic and lumbosacral spine, no musculoskeletal wasting, 4/5 muscle strength and handgrip, and negative straight leg raising test (R. 41).

35.  The ALJ noted Plaintiff admitted "to no significant pain relief from any of her numerous medications, instead choosing to emphasize respective side effects. On the other hand, while rejecting recommended physical therapy efforts and any vocational rehabilitation, she readily admits to experiencing a degree of relief from those therapeutic means which tend to require, confirm or validate her sedentary status, such as massages, whirlpools and hot tubs" (R. 37).

36.  Plaintiff's "avoidance of any forms of recommended therapy for her fibromyalgia that involves significant physical activity"; specifically, Plaintiff's claim that she was unable to "undergo any type of physical activity whatsoever" and her claim that three attempts at physical therapy failed and made her condition worse. The ALJ found the physical therapist's notes reflected Plaintiff had improved during physical therapy (R. 35).

37.  The ALJ noted Plaintiff's retention of her mental capabilities were demonstrated in the production of "evidentiary byproducts of her substantial research efforts with regard to her condition and ability to articulate and advocate her various contentions" (R. 25).

38.  Dr. Marshall's testimony at the administrative hearing was that he was "unable to conclude that the claimant had any disabling physical condition" (R. 26).

39.  Plaintiff's testimony that she weighed 145 pound when she stopped working in 1995 and that her weight had increased to 200; the ALJ noted Plaintiff weighed 178 pounds in February 1995 and 181 pounds in November 1995. The ALJ also noted Plaintiff's weight did not exceed 185 pounds in 1996, 1997, or 1998, as claimed by Plaintiff (R. 37).

40.  Plaintiff's "substantial mental capacity" to offer information, "draw support from independent resources," "sift through, rebut and challenge unfavorable evidence or opinions," read medical evidence and "relevant research/reference/resource materials," produce a "cumulative volume of typed and handwritten material that belies the mental and physical limitations that allegedly restrict drastically her writing and cognitive abilities" (R. 32).

The undersigned finds the Plaintiff's subjective allegations relative to her pain and limitations were not supported by the medical history of record, the medical signs and laboratory findings, the objective evidence relative to her pain, her activities, and the medical treatments recommended for alleviation of her symptoms. In thoroughly analyzing the record of evidence as detailed above, the ALJ was supported in his finding that Plaintiff was "not entirely credible" (R. 42). Except for a diagnosis of fibromyalgia by Dr. Gade, no other physician has diagnosed Plaintiff with that disease, and Dr. Gade did not opine Plaintiff was disabled because of fibromyalgia. To the contrary, Dr. Gade recommended an aggressive exercise program to alleviate Plaintiff's symptoms (R. 34). Dr. Calhoun's opinions relative to Plaintiff's ability to perform work fluctuated, were based on his self-professed limited knowledge of fibromyalgia, and were adequately weighed and considered the ALJ (R. 39, 41). No psychologist or psychiatrist found Plaintiff to be impaired in her mental functioning; no state agency physician found Plaintiff unable to perform work activity; and except for Dr. VanPelt, no consulting or examining physician found Plaintiff to be physically disabled. The ALJ afforded "no particular weight to the opinion of" Dr. VanPelt because he evaluated Plaintiff once and based that evaluation on Plaintiff's own subjective allegations of pain, not on any objective medical signs or laboratory findings (R. 40). The undersigned finds substantial evidence supports the ALJ's determination regarding the credibility of Plaintiff's complaints of pain and other functional limitations.

## D. Weight Given to Medical Evidence and Opinions

Plaintiff argues the ALJ erred by affording no weight to a number of vocational and medical opinions because those opinions included consideration of the Plaintiff's symptoms. Defendant argues substantial evidence supports the ALJ's evaluation of the medical evidence and opinions of record.

In her brief, Plaintiff alleges the ALJ "dismissed as not credible every medical opinion in this record that relied on symptoms as a factor in the opinion." (Plaintiff's brief at p. 7.) Plaintiff fails, however, to cite any legal authority to support her assertion that the ALJ's assignment of weigh to these opinions was "illogical, improper, and not supported by the evidence." (Plaintiff's brief at p. 10.) A review of the record shows the ALJ thoroughly considered and evaluated the opinions of those individuals who treated or examined Plaintiff, the opinions of those physicians who conducted consultative or other examinations of Plaintiff, the opinions of non-examining physicians, and the opinions of Dr. Calhoun, Plaintiff's treating physician, in order to assign weight to them.

Plaintiff asserts the ALJ found the following "medical opinions . . . not credible . . ." because they took Plaintiff's symptoms into account: 1) the opinion of physical therapist Mark King, who opined Plaintiff could perform only minimal work activities, could not return to her previous work, and who required work that allowed frequent position changes and work at her own pace (R. 255); and 2) the opinion of vocational consultant Lisa Jenkins, who opined Plaintiff could not return to her previous work, could not be engaged in other substantial gainful activities, could not be retrained for other work, and that Plaintiff was totally disabled (R. 227-28). (Plaintiff's brief at pp. 7-8.) 20 C.F.R. § 404.1513 identifies acceptable medical sources "who can provide evidence to establish an impairment" as follows: 1) licensed physicians; 2) licensed or certified psychologists; 3) licensed optometrists; 4) licensed podiatrists; and 5) qualified speech-language pathologists. A physical therapist and a vocational consultant do not qualify as acceptable medical sources. The ALJ addressed the findings of Mr. King and Ms. Jenkins in his decision; however, in conformance with the language in 20 C.F.R. § 404.1513, he did not afford any weight to their opinions as neither individual was an acceptable medical source (R. 40). *See Craig v. Chater*, 76 F.3d 585 (4th Cir.

1996) (holding "Administrative law judge (ALJ) did not err in failing to expressly consider patient's physical therapist's report when determining whether patient was disabled under Social Security Act where physical therapist did not qualify as acceptable medical source under regulations, but rather would qualify only as an 'other source,' whose opinions were entitled to significantly less weight."). The undersigned finds there is substantial evidence of record to support the ALJ's decision relative to the opinions of the physical therapist and the vocational consultant.

Plaintiff asserts the ALJ found the opinions of Drs. Fichter, VanPelt, Marshall, and Thimmappa not credible because these doctors took Plaintiff's "symptoms into account." (Plaintiff's brief at pp. 7-9.) Plaintiff asserts Dr. Fichter's opinion that Plaintiff was temporarily totally disabled and could return to work once her medications were tailored to her needs was found not credible by the ALJ. (Plaintiff's brief at p. 7.) A review of the ALJ decision shows he did consider these opinions by Dr. Fichter; however, contrary to the assertion of Plaintiff, the ALJ did not find the opinion of Dr. Fichter not credible. The ALJ noted Plaintiff had "added a written rebuttal on the doctor's report, expressing her opinion that 'many drugs and treatments have been tried unsuccessfully.'" Additionally, the ALJ noted Plaintiff had written in "1998 that Dr. Fichter had categorized her as totally disabled at the time of his [July 1997] examination"; however, the ALJ observed that assertion was incorrect (R. 35-36). In that section of the ALJ's decision in which he afforded "specific regard to the objective medical evidence of record," the ALJ discussed Dr. Fichter's opinion that Plaintiff could "be and should be rehabilitated to perform another task'" (R. 38, 39). The undersigned, therefore, finds the ALJ did not find Dr. Fichter's opinion lacking in credibility, but he properly weighed and considered the evidence offered by Dr. Fichter in rendering his decision.

Plaintiff asserts the ALJ found the opinion of Dr. VanPelt not credible because he based his observations and findings on Plaintiff's symptoms. Relative to Dr. VanPelt, the ALJ found the following:

> Evaluating orthopedic surgeon Philip R. VanPelt, M.D. on March 8, 2000 described the claimant's history as "a difficult case," and offered a diagnosis of chronic pain syndrome, "possible fibromyalgia." He noted her original injury to be trivial, and that she could "pretty much do everything it is just painful for her." While the physician deferred judgment as to impairment to a rheumatologist, he nonetheless offered an opinion that the claimant was "permanently and totally disabled from gainful employment in view of her work experience, educational level and her physical condition." The doctor acknowledged that the information contained in his report was primarily obtained from the claimant by way of history and physical examination. . . . The Administrative Law Judge assigns no particular weight to the opinion of this physician, who evaluated the claimant on one occasion primarily on the basis of her subjective allegations of pain. . . . The undersigned notes that Dr. VanPelt felt obliged to defer more definitive or objective diagnoses to a rheumatologist (R. 40).

The Fourth Circuit has held, in *Craig, Id.*, that 1) a "[d]octor's conclusory opinion that patient was disabled, which was based upon patient's subjective reports of pain, was properly rejected . . . where record contained persuasive contradictory evidence, including doctor's own notes, that medical tests results generally came back normal and that patient, although reporting she was experiencing aching all over, was able to perform household work . . ." and that 2) a doctor's observation of a person does not transform those observations into "'clinical evidence.'" The ALJ in the instant case "properly rejected," or, more accurately, "assign[ed] no particular weight" to Dr. VanPelt's opinion because it was "obtained from the claimant by way of history," through his one examination of Plaintiff, and from her statements to Dr. VanPelt during that examination. *Craig, Id.* (R. 40). During the March, 2000, examination of Plaintiff by Dr. VanPelt, he noted Plaintiff could "pretty much do everything" but she complained of "pain at the extremes" of all range of

motion testing. Plaintiff demonstrated a "near normal range of motion of . . . cervical spine"; a full range of motion of her shoulders, elbows, and wrists; normal gross sensation perception of soft touch; no "particular discomfort on circumferential pressure of her wrists"; negative compression, flexion, and Tinel's signs in both wrists; back motion of nearly ninety degrees; full range of motion of her knees; and negative straight leg raising test to ninety degrees in sitting position (R. 264-65). The results of these tests constitute "persuasive contradictory evidence"; therefore, the undersigned finds there is substantial evidence to support the ALJ's decision to assign "no particular weight to the opinion" of Dr. VanPelt.

Plaintiff asserts the ALJ found the medical opinion of Dr. Marshall not credible because he took Plaintiff's symptoms into account. Dr. Marshall testified at the October 2003 administrative hearing that Plaintiff's "condition was attributable to a psychological rather than a physical disorder"; that Plaintiff "essentially had a somatoform disorder"; that "he would be 'lying' if he said he thought that [Plaintiff] was 'physically disabled'"; and that Plaintiff "was 'probably unfit' to work, more so on the basis of psychological symptoms" (R. 25). The ALJ discussed and analyzed his testimony as follows:

> Dr. Marshall essentially reached his opinion as to explanation for the claimant's subjective allegations in the absence of any convincing objective evidence. It is noted that the medical expert himself acknowledged that physicians tend to assign names to a condition or diagnosis when they cannot otherwise identify an objective medical basis. The Administrative Law Judge finds it significant that the medical expert did not address the claimant's credibility, a significant component of any determination as to a condition that may only be established by subjective statements and presentation. Thus, the Administrative Law Judge does not accept Dr. Marshall's claimant diagnosis of somatoform disorder or find controlling herein his opinion as to the claimant's work related ability. He never examined the claimant. He has no particular expertise with regard to psychological disorders. The undersigned does find it significant that the expert was unable to conclude that the claimant had any disabling physical condition (R. 26).

67

Dr. Marshall is not an expert in psychological disorders; he is an internist and cardiologist. He did not examine Plaintiff; his opinions were based on Plaintiff's subjective allegations as contained in the record he reviewed in preparation for his testimony (R. 783). As noted, the Fourth Circuit has held it is proper to reject a medical opinion when it is based on the Plaintiff's subjective complaints and persuasive contradictory evidence exists in the record as to those subjective complaints. *Craig, Id.* The persuasive contradictory evidence in the record as to Plaintiff's psychological symptoms, which was considered by the ALJ, was as follows:

1.  Dr. Fremouw's March 1998 finding that Plaintiff's activities of daily living, social functioning, and concentration and pace were found to be no more than mildly impaired and her memory was found to be intact (R. 23).

2.  March 1999 psychiatric evaluation, in which Plaintiff was found to be in no acute emotional distress; to be pleasant, cooperative, alert, interested, and attentive; to have good insight; to have less than perfect judgment; to have some difficulty with short term memory (R. 23).

3.  July 12, 2000, consultative mental status evaluation, in which Plaintiff was found to have normal judgment, concentration, and memory (R. 23).

4.  July and November 2000 reports by state agency physicians that Plaintiff had no severe mental impairments and was capable of a full range of work (R. 24).

5.  February 2002 opinions of Mr. Levin that Plaintiff's judgment, memories, behavior, and concentration were either "average, good or otherwise within normal limits" and her activities of daily living included "pick[ing] up around the house," doing a little housework, doing dishes, driving, reclining on the couch, and watching television. His diagnosis was for depressed mood with good prognosis (R. 25,41).

This is persuasive contradictory evidence, offered by at least four mental health professionals who examined Plaintiff, that Plaintiff did not have from a severe mental impairment, specifically, a somataform disorder. Additionally, 20 C.F.R. § 404.1527(d)(3) reads that more weight will be given to medical opinions in which relevant evidence is presented to support an opinion, particularly

medical signs and laboratory findings. Dr. Marshall offered no such support to his opinion that Plaintiff "seem[ed]" to have a somatoform disorder (R. 796). The ALJ's decision to not accept Dr. Marshall's opinion that Plaintiff may have somatoform disorder is supported by substantial evidence.

Plaintiff also contends the ALJ found the medical opinion of Dr. Thimmappa not credible because he based his findings on Plaintiff's symptoms. Dr. Thimmappa found Plaintiff could walk less than two hours in an eight-hour workday and sit less than about six hours in an eight-hour workday (R. 755-56). The ALJ "placed no inordinate or undue reliance upon the findings" of Dr. Thimmappa, but found "them to be appropriate and relevant to the determination" relative to Plaintiff's level of disability (R. 41). The ALJ was justified in not relying on Dr. Thimmappa's opinion because it was based on Plaintiff's statements that she could carry no more than five pounds, she had multiple tender points, she had multiple trigger points, and she had a history of fatigue (R. 41). Additionally, Plaintiff told Dr. Thimmappa she could not stand for more than ten or fifteen minutes and she had headaches, low back pain, high blood pressure, and acid reflux (R. 750-51). See Craig, Id., (holding "Doctor's conclusory opinion that patient was disabled, which was based upon patient's subjective reports of pain, was properly rejected . . . where record contained persuasive contradictory evidence, including doctor's own notes . . . ."). The record contained persuasive contradictory evidence, found in the notations of Dr. Thimmappa, relative to Plaintiff's abilities. Although Dr. Thimmappa found Plaintiff had lumbar muscle spasm, he noted she had normal movement of her cervical spine, slightly restricted movement of her thoracic and lumbosacral spine, no musculoskeletal wasting, negative straight leg raising test, and muscle strength and handgrip of 4/5 (R. 41). The record also contained notations by Dr. Thimmappa that Plaintiff walked with a normal gait, walked on her heels and toes, and wrote and picked up coins. Plaintiff's

69

HEENT, cardiovascular, respiratory, gastrointestinal, and genitourinary examinations were normal (R. 751). Dr. Thimmappa's examinations of Plaintiffs neck, chest, lungs, heart, abdomen, extremities, neurological system, musculoskeletal system, and joints produced normal results (R. 752). The objective medical evidence, provided by Dr. Thimmappa and based on his examination of Plaintiff, is "persuasive contradictory evidence" that Plaintiff's physical condition was not totally disabling. *Craig, Id.* The ALJ's assignment of "no inordinate or undue reliance" on the findings of Dr. Thimmappa was well founded in that his findings were based on Plaintiff's reported limitations and complaints of pain. The undersigned, therefore, finds there is substantial evidence to support the ALJ's decision relative to Dr. Thimmappa's opinion.

Plaintiff also asserts the ALJ afforded no weight to certain medical opinions of Dr. Calhoun, Plaintiff's treating physician, because Dr. Calhoun took into account Plaintiff's symptoms and because Plaintiff had been an employee of Dr. Calhoun. (Plaintiff's brief at p. 9.) Those opinions of Dr. Calhoun to which Plaintiff referred are as follows: 1) a June 1998 functional capacity questionnaire in which Dr. Calhoun noted Plaintiff was not a malingerer, had pain that would interfere with concentration and attention, had marked limitations to deal with work stresses, could sit/stand for less than two hours per day, and was incapable of working for eight hours; 2) the November 1998 opinion of Dr. Calhoun that it would be difficult for Plaintiff to work on any regular basis, she would have to change positions frequently, she would have to lie down, she continued to experience pain and exhaustion, and her inability to concentrate would preclude her from working; and 3) the September 1999 opinion of Dr. Calhoun that Plaintiff could not return to her past work as an LPN because of pain, fatigue, and lack of concentration, could not bear the burden of working eight hours, would have to change positions frequently, would have to have rest periods, would have

some days of no work, and would "like to feel better and be back to work, but that is not possible at this time." (Plaintiff's brief at pp. 9-10.) Defendant asserts Plaintiff's treating physician's opinions were "internally inconsistent" and "completely inconsistent with the other objective evidence of record." (Defendant's brief at pp. 16-18.)

SSR 96-2p states, in part:

Controlling weight. This is the term used in 20 CFR 404.1527(d)(2) and 416.927(d)(2) to describe the weight we give to a medical opinion from a treating source that must be adopted. The rule on controlling weight applies when all of the following are present:

1. The opinion must come from a "treating source," as defined in 20 CFR 404.1502 and 416.902. Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to "controlling weight."

2. The opinion must be a "medical opinion." Under 20 CFR 404.1527(a) and 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight.

3. The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.

4. Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record.

If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight. It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record. However, when all of the factors are satisfied, the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion.

As asserted by Defendant, the above noted opinions of Dr. Calhoun are inconsistent with

other substantial evidence in the case record, including evidence offered by Dr. Calhoun himself, and, therefore, as mandated by SSR 96-2p, cannot be afforded controlling weight.

Even though Plaintiff asserts the ALJ based his decision to provide no weight to Dr. Calhoun's opinions because they were based on Plaintiff's subjective complaints and her past working relationship with Dr. Calhoun, a review of the record shows the ALJ based his decision, in part, on the internal inconsistencies that existed in Dr. Calhoun's own opinions. The ALJ noted Dr. Calhoun opined, in the April 1998 letter to which the November 1998 letter referred, that Plaintiff could "be retrained for more sedentary work," but then opined in June 1998, that Plaintiff could "sit or stand for less than two hours within an eight-hour workday, and she could not complete an eight-hour workday" (R. 39, 737). The ALJ then noted that Dr. Calhoun opined, in June 2000, that Plaintiff "would have to have a 'sedentary job with very flexible hours and complete time off sometimes'" (R. 39). In a second June 2000 opinion by Dr. Calhoun, he found Plaintiff could "perhaps return to sedentary or light duty" (R. 40). The ALJ did not "accord Dr. Calhoun's opinions any controlling weight." He noted that, "[w]hile [Dr. Calhoun's] claimant-related diagnoses and opinions appear well intended, in the opinion of the Administrative Law Judge they also tend to evidence a significant degree of caution, hesitancy, and occasional uncertainty" (R. 39). He also opined that he noted Plaintiff's "former treating physician Dr. Calhoun has voiced a number of opinions sometimes indicative of the claimant's near total disability, and at others seemingly allowing for the possibility that she could perform sedentary work. He acknowledges his lack of expertise concerning fibromyalgia . . ." (R. 41). The undersigned finds the ALJ did consider the opinions by Dr. Calhoun, he did evaluate them in determining the weight to be afforded to them, and he did note inconsistencies in the opinions Dr. Calhoun offered as to Plaintiff's limitations.

The ALJ also identified, considered, and weighed the following substantial evidence of record with which Dr. Calhoun's above noted opinions were inconsistent:

1.  November 1995 diagnosis by Dr. Caplan, a rheumatologist, of autonomic dysfunction and myofascial pain syndrome, not fibromyalgia, and his opinion Plaintiff could return to light work (R. 32).

2.  March 1996 opinion of Dr. Garvin that he "would be hard pressed to diagnose [Plaintiff] with any specific pain disorder, as her laboratory work was essentially normal" (R. 38).

3.  May 1996 opinion of Dr. Davis that Plaintiff was in "'good health'" relative to her intent to pursue an associate nursing degree (R. 33).

4.  September 1996 diagnosis of Dr. Morehead of diffuse pain syndrome from a trivial injury and his opinion that Plaintiff's "'symptoms did not fit the classical trigger point requirements'" for fibromyalgia (R. 34).

5.  November 1996 observations of Dr. Patel that Plaintiff had 5/5 strength, had no signs of atrophy, could squat and rise, could walk on heels and toes, and had normal gait. He diagnosed "'questionable fibromyalgia'" and recommended Plaintiff be evaluated by a rheumatologist (R. 39).

6.  January 1997 opinion of state agency physician that Plaintiff could perform medium work (R. 39).

7.  April 1997 opinion of state agency physician that Plaintiff could perform medium work (R. 39).

8.  May 1997 diagnosis of fibromyalgia by Dr. Gade, who observed Plaintiff was in no acute distress, had normal strength, had normal range of motion and who advised Plaintiff to be actively involved in her rehabilitation program by walking daily and beginning a physical therapy program (R. 34).

9.  July 1997 opinion of Dr. Fichter that Plaintiff was temporarily totally disabled and could "return to the work force once her medications had been tailored to meet her needs" (R. 35).

10. March 1998 consultative psychological evaluation by Dr. Fremouw, in which Plaintiff's activities of daily living, social functioning, and concentration and pace were found to be no more than mildly impaired and her memory was found to be intact (R. 23).

11.   March 1999 psychiatric evaluation, at which Plaintiff stated she was suppose to be taking Prozac, but "deliberately forgot" to take it. Plaintiff was found to be in no acute emotional or physical distress; to be pleasant, cooperative, alert, interested, and attentive; to have good insight; to have less than perfect judgment; to have some difficulty with short term memory (R. 23).

12.   March 2000 opinion of Dr. VanPelt that Plaintiff had chronic pain syndrome and that she could "'pretty much do everything it is just painful for her.'" Dr. VanPelt deferred an assessment of Plaintiff's impairment to a rheumatologist (R. 40).

13.   July 12, 2000, consultative mental status examination, at which Plaintiff was found to have normal judgment, concentration, and memory (R. 23).

14.   July and November 2000 reports by state agency psychologists that Plaintiff had no severe impairments and was capable of a full range of work (R. 24).

15.   July and November 2000 opinions by state agency physicians that there was no objective evidence of any exertional or nonexertional limitation to Plaintiff and that she could perform a full range of work (R. 40).

16.   July 2000 notation by Dr. Paroda during his consultative physical examination of Plaintiff that she was "vague and evasive," avoided answering questions, ambulated normally, was comfortable standing/sitting/supine, did not appear fatigued, and presented with some "'myalgias and arthralgias'" that did not "'correspond with what is typically found in fibromyalgia or chronic fatigue'" (R. 24, 40).

17.   February 2002 finding of Mr. Levin that Plaintiff's judgment, memories, behavior, and concentration were either "average, good or otherwise within normal limits" and that Plaintiff's activities of daily living included "pick[ing] up around the house," doing a little housework, doing dishes, driving, reclining on the couch, and watching television. Mr. Levin diagnosed Plaintiff's mood as depressed and noted Plaintiff's prognosis was good (R. 25, 41).

18.   February 2002 observations by Dr. Thimmappa that Plaintiff experienced lumbar muscle spasms, normal movement of cervical spine, slightly restricted movement of her thoracic and lumbosacral spine, no musculoskeletal wasting, 4/5 muscle strength and handgrip, and negative straight leg raising test (R. 41).

19.   Dr. Marshall's testimony at the administrative hearing was that he was "unable to conclude that the claimant had any disabling physical condition" (R. 26).

As stated above, the ALJ did not afford Dr. Calhoun's opinions controlling weight (R. 39). The

Fourth Circuit has held, in *Hunter v. Sullivan*, 993 F.2d, 31, 35 (1992), that the ALJ is not required to give controlling weight to the opinion of the treating physician when there is persuasive contrary evidence. Additionally, the Fourth Circuit has held the opinion of the treating physician is entitled to less weight if it is inconsistent with the other substantial evidence of record. *Craig, supra*, at 590. The substantial evidence of record, as noted above by the ALJ, supports his not assigning controlling weight to the opinion of Dr. Calhoun because it constitutes persuasive evidence that contradicts Dr. Calhoun's opinions.

The Fourth Circuit has also held that the ALJ may rely on the opinions of non-examining physicians when they are consistent with the record. *See Gordon v. Schweiker*, 725 F.2d 231, 232. The ALJ, in the instant case, did just that. Relative to Plaintiff's mental status, the ALJ relied on the "four comprehensive psychological examinations and related assessments made by the State Agency to be more reliable in concluding that the claimant evidences no severe, medically determinable mental impairment" (R. 26-27). Additionally, the ALJ placed "significant weight upon the findings of the State Agency, and [found] the reports of the State's consultative examining physicians and psychologists as a whole reasonable, reliable and convincing" (R. 42).

In consideration of all of the above, the undersigned finds the ALJ acted in accordance with SSR 96-2p and did not err in his assignment of weight to the medical opinions of the treating physician.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment

be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable W. Craig Broadwater, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _3_ day of _May_ , 2006.

_____
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE